# United States Court of Appeals
## For the First Circuit

No. 10-2342

CLAUDINE BHATTI,

Plaintiff, Appellant,

v.

TRUSTEES OF BOSTON UNIVERSITY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Selya, and Thompson,
Circuit Judges.

Richard A. Mulhearn, with whom the Law Office of Richard A. Mulhearn, P.C. was on brief, for appellant.
Lawrence S. Elswit for appellees.

October 3, 2011

**THOMPSON**, **Circuit Judge**.  For the better part of a decade, Claudine Bhatti has been a dental hygienist at Boston University's Dental Health Center.  She claims that a series of supervisors at the Center subjected her to unpaid work hours because she is black and then to selective discipline and other malfeasance in retaliation for questioning her unpaid hours.  On the University's[1] motion for summary judgment, the district court discerned only a series of essentially interpersonal grievances insufficient to support Bhatti's claims.  After careful review of the record, we agree with the district court that the evidence does not support Bhatti's claims.  We affirm.

Because Bhatti's case is before us on her appeal from a grant of summary judgment for the University, our framing of the facts reflects the evidence in the light most favorable to her. See Martínez-Rodríquez v. Guevara, 597 F.3d 414, 416 n.1 (1st Cir. 2010).

Bhatti — who, again, is black — began working at the Center in January 2003, joining fellow dental hygienists Sally Baldwin, Anne Jensen, and Julie Lidano, all of whom are white.  Dr. Eyad Haidar was Director of the Center from the time of Bhatti's hire until July 2006.  Reporting to Dr. Haidar was the Center's Manager Jacqueline Needham, who directly supervised the hygienists.

---

[1] Although the Trustees of Boston University are the named defendants, for ease of reference we will treat the University as if it were the defendant.

-2-

In 2004 the Center hired hygienist Stefanie Charity, who is black, bringing the racial balance of the hygienists to three-to-two.

The Center's alleged discrimination against Bhatti began right at the outset of her employment in 2003, as Needham told her she had to perform a half-hour of unpaid setup time every morning in addition to her basic forty-hour workweek. In contrast, Bhatti says, the three white hygienists were credited for their setup time as a part of their forty-hour weeks.[2] Under Needham's supervision, Bhatti maintains, she was thus subjected to a 45-hour[3] workweek while her white coworkers worked only the 40 hours they were paid for.[4] Making matters worse, she claims, a so-called unwritten rule allowed her white counterparts to take extended lunch breaks and leave up to 15 minutes[5] early without having to place a written

---

[2] Some of the other hygienists worked part-time for some portion of the relevant time period, but there was always at least one full-time hygienist besides Bhatti. For purposes of comparison, we focus only on the full-time hygienists from here on out.

[3] Bhatti's claimed 45-hour workweek combines her scheduled 42.5 hours of work with her contested 2.5 hours of unpaid setup time, and it ignores her not-at-issue daily hour-long lunch break. We note that actually subtracting her five weekly hours of lunch nets a 40-hour workweek.

[4] Bhatti says that when confronted about these discrepancies, Dr. Haidar claimed that they were a result of the hygienists' having been hired under different administrations. This is peculiar, but in the end it's neither here nor there because the record does not reflect any actual scheduling discrepancies.

[5] There is one instance in the record of a white hygienist taking 30 minutes under the unwritten rule, but this appears to be an anomaly.

request and without being charged sick or vacation time. But if Bhatti wanted a similar deviation from her scheduled workday — an extended lunch or early departure — she had to submit a written request, and Needham would deduct the time from Bhatti's bank of sick or vacation time. At least this is the picture Bhatti paints; as we will discuss later, not all of Bhatti's claims have an adequate evidentiary foundation in the record.

In 2005, Bhatti confronted Needham about the perceived disparities based on an unwritten rule. Needham protested and proclaimed offense, and Dr. Haidar was drawn into the dispute. He clarified that the unwritten rule was just professional courtesy that applied to Bhatti, too, while reserving the right to approve or disapprove any scheduling deviations as might be necessary.[6] Bhatti requested that Dr. Haidar restore to her a backlog of sick and vacation time (or to compensate her for the time) in order to honor the unwritten rule post hoc, but he declined to do so.

Bhatti's scheduling concerns ended in August 2005, when the Center switched all the hygienists from salaried to hourly status,[7] ensuring that their pay would reflect the time they

---

[6] Bhatti has suggested that Dr. Haidar only acknowledged deviations of up to ten minutes. Again, this suggestion is neither here nor there because the record does not reflect any actual disparities.

[7] Apparently this change was a response to new guidelines issued by the United States Department of Labor interpreting the Fair Labor Standards Act. As neither party discusses the change in any depth and the issue is, in any event, tangential, we need not

actually worked and that they would be paid overtime for any hours over their base forty. But just as one problem ended, another began.

After her confrontation with Needham and her followup with Dr. Haidar, Bhatti says, Center management began retaliating against her. Specifically, she began receiving written reprimands for infractions that she says either were minor or didn't occur at all.

On September 7, 2005, Bhatti was called to a meeting with Needham and Dr. Haidar; there, she was presented a memo discussing "three performance issues that continue to be a problem despite our many conversations": (1) an occasion where she had supposedly left the Center during the workday without permission; (2) an occasion where she had taken a sick day but failed to produce a doctor's note; and (3) an occasion where she had used a cell phone at work. Bhatti vigorously contested these purported performance issues, explaining: (1) that she had arranged for a coworker to see her patient while she rested in a vacant workstation because she felt ill; (2) that the sick note policy was unevenly applied and, furthermore, that far from abusing sick days, she had accrued an entire month of unused leave; and (3) that she only used her cell phone at work in emergency situations.

---

delve into it.

On September 12, 2005, Dr. Haidar issued a memo chastising Bhatti for making a "derogatory remark" to Needham about another Center manager, Yu-Wen Szeto. Specifically, after Szeto had accused Bhatti of leaving two hours early without approval, Bhatti said to Needham, "That is a lie!" Bhatti told Dr. Haidar that she had not actually left the Center early and that her remark was not actually derogatory.

On September 26, 2005, Bhatti met with Dr. Haidar and two University officials and complained to the University that the Center was subjecting her to racial discrimination. On September 30, Bhatti submitted a formal complaint to the University's Office of Equal Opportunity and Affirmative Action.[8] And finally on November 1, Bhatti filed charges with the Massachusetts Commission Against Discrimination (MCAD); the University responded in December, denying any discrimination.[9] Around this time, Bhatti began seeing a therapist for treatment of job-related anxiety.

In the middle of this, on October 21, 2005, Needham and Dr. Haidar again called a meeting with Bhatti to discuss alleged performance issues. As usual, Bhatti disputed each of these issues. And on June 22, 2006, Dr. Haidar issued yet another

[8] The Equal Opportunity Office eventually found no evidence of discrimination.

[9] It is unclear from the record whether anything ever came of the MCAD petition. For our purposes, though, all that matters is that she filed it.

letter, this time reprimanding Bhatti for claimed insubordination — faced with conflicting duties due to a scheduling snafu, Bhatti had protested Dr. Haidar's request that she see a patient during a meeting she was also supposed to attend. Once again, Bhatti disputed the claim, noting that despite her initial protest she did see the patient as Dr. Haidar had requested.

In July 2006, Dr. Haidar left the Center and Dr. Margaret Errante took his place. Conditions markedly improved, although Bhatti still complained about Needham's arbitrary supervision. In March 2008, Dr. Errante forced Needham's resignation.

On August 6, 2008, Bhatti filed this action alleging discrimination, retaliation, and a hostile work environment in violation of various federal laws.[10] The University answered and, in April 2010, filed a motion for summary judgment denying any discrimination but acknowledging that Bhatti had worked under less-than-stellar management. Bhatti responded, pointing to scads of evidence documenting grievances that she claimed could only be the result of animus rather than reason.

On October 19, 2010, the district court granted the motion, holding that none of Bhatti's grievances, individually or in the aggregate, rose to the level of an adverse employment action necessary for her to succeed in her suit. The district court

---

[10] Bhatti amended the complaint two days later; this amended complaint is the operative one.

further held that the University had presented evidence establishing that its bad management practices applied across the board to employees of all races and that Bhatti had failed to respond with adequate evidence of actual animus. Final judgment entered on the same date. Bhatti timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

We review the district court's summary judgment grant de novo, assessing the arguments and the record ourselves and affirming only if the record reveals undisputed facts that entitle the University to judgment as a matter of law. See Baltodano v. Merck, Sharp, and Dohme (I.A.) Corp., 637 F.3d 38, 41 (1st Cir. 2011).

Bhatti grounds her claims in both Title VII[11] and 42 U.S.C. § 1981.[12] The same legal framework applies to both statutory bases. See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18-19 (1st Cir. 1999). This framework allows for distinct claims of

---

[11] Title VII, at 42 U.S.C. § 2000e-2(a)(1), declares that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."

[12] 42 U.S.C. § 1981(a) provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Section 1981(b) defines "make and enforce contracts" as including "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Section 1981(c) extends these protections "against impairment by nongovernmental discrimination."

disparate treatment, retaliation, and hostile work environment, all of which Bhatti alleges, and all of which fit into the familiar McDonnell Douglas burden-shifting scheme. See id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). We'll spell out each claim in more detail below, but in general for a claim to survive summary judgment under the burden-shifting scheme Bhatti must first point to evidence making out a prima facie case. Id. at 19. If she does so, this evidence creates a presumption of discrimination that the University may rebut by pointing to evidence of legitimate, non-discriminatory reasons for the challenged conduct. Id. And if the University succeeds on this showing then Bhatti may still prevail by pointing to evidence that these reasons, though facially legitimate, are actually pretextual. Id. Applying this framework, we begin by assessing Bhatti's discrimination claim, then move on to retaliation, and finish with hostile work environment.

Bhatti claims that the University discriminated against her in several ways, first and most notably by requiring that she, but not her white counterparts, perform unpaid setup time. A prima facie case for discrimination based on disparate treatment presents a four-part test: (1) the plaintiff must be a member of a protected class; (2) she must be qualified for her job; (3) she must suffer an adverse employment action at the hands of her employer; and (4) there must be some evidence of a causal connection between her

membership in a protected class and the adverse employment action, e.g., in the case of a firing, that the position was filled by someone with similar qualifications.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000).

Essentially collapsing prongs three and four, Bhatti contends that she had to work two-and-a-half more hours per week than her white counterparts, without compensation.  The University responds that the record does not support Bhatti's claim of scheduling disparities but instead shows that Bhatti and the white hygienists worked and were paid for the same number of hours.  These positions are mutually exclusive, so it falls to us to examine the record and see who is correct (or whether there is a genuine dispute).

Bhatti's main evidence is her own interrogatory answers and unsworn, out-of-court statements that she "learned" and "became aware" of the alleged disparity because her coworkers "told" her they were paid for setup time.  But Bhatti's tenuous mentions of her coworkers' out-of-court statements all constitute inadmissible hearsay.  See  Dávila v. Corporación de Puerto Rico Para La Difusión Pública, 498 F.3d 9, 17 (1st Cir. 2007).  Bhatti has pointed to no hearsay exception that might apply.  And "[i]t is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted."  Hannon v.

Beard, 645 F.3d 45, 49 (1st Cir. 2011) (internal quotation marks omitted). This makes sense. There is no way to test the reliability of an amorphous, out-of-court statement or to gage the intentions or credibility of the person who made the statement. See United States v. Benitez-Avila, 570 F.3d 364, 367-68 (1st Cir. 2009). So, because they depend on hearsay, Bhatti's interrogatory answers and other references to her coworkers' out-of-court statements can have no bearing on our conclusion.

Other than that now-discounted evidence, Bhatti points to the following spots in the record to support her claim of scheduling disparities: (1) a schedule showing the white hygienists' hours two years before Bhatti was hired, when the Center operated under a different supervisor; (2) Needham's testimony supporting the uncontroversial proposition that "different employees work[ed] different hours"; and (3) her own statement of undisputed facts from the district court record, which has no independent evidentiary value but merely references sources (1) and (2). None of these even remotely shows that "the schedules of the three white hygienists made for a shorter workday than their black counterparts" — the proposition they're cited to support. Instead, the admissible evidence in the record — schedules showing Bhatti's and the white hygienists' work hours and deposition testimony from the other hygienists — indicates that unpaid setup time was standard. The record reveals no scheduling disparity.

Bhatti also relies on other alleged disparities in the University's treatment of the hygienists, particularly the application of "workplace rules about the hygienists having to request time off and be docked sick time when leaving early or taking an extended lunch."[13] More specifically, Bhatti alleges that the other hygienists worked under an unwritten rule that a deviation from the schedule of 15 minutes or less did not require a supervisor's approval, but that she was unaware of this "rule" for her first two years of employment. There are several problems with this argument.

First, the rule was not a rule at all, but rather an acknowledgment on the part of Center directors that their hygienists were professionals who could be trusted to perform their work duties without recourse to draconian schedule enforcement. Dr. Haidar said allowing the hygienists to leave 10-15 minutes early at the end of the day when they had no work duties left to perform was simply a matter of trust that he extended to everyone. Indeed, the evidence all suggests that the "rule" was nothing insidious at all but rather simple professional courtesy.

---

[13] Bhatti notes in a parenthetical sentence that "[o]ne, of course, questions whether this practice was lawful under federal and state wage laws where the hygienists were supposed to be salaried, exempt workers." We need not consider this rhetorical question, though, because it was not raised in the complaint, developed below, or really addressed at all.

Additionally, there is no evidence that Bhatti was ever actually denied this professional courtesy. For one, the other hygienists testified that they only took advantage of it occasionally, in particular when their last patient of the day failed to show. But the evidence indicates that when Bhatti's last patient of the day cancelled, she would generally take 45 minutes to an hour off instead of staying at the Center until the workday was almost complete. In fact, Bhatti never submitted a leave request seeking fewer than 20 minutes off. There's simply no indication in the record — and, most importantly, no testimony from Bhatti — that she ever would have departed work 15 minutes early but did not because she was unaware that leaving early was an option. Instead, Bhatti's evidence reflects only vagaries and generalities about how, e.g., she "had been required to submit a form requesting time off when she left early." This statement, and the rest of Bhatti's evidence on this point, does no more than reflect the Center's formal policy of requiring leave request forms but occasionally bypassing this requirement as a professional courtesy if work wrapped up early at the end of the day. In the end, the evidence shows that all hygienists had to submit a leave request if they left more than 15 minutes early and that no hygienists, including Bhatti, had to submit a leave request if they left fewer than 15 minutes early, so we can discern no disparate treatment.

Finally, even if we assume — despite the above discussion — that Bhatti has made out a prima facie case of discrimination, the claim fails under the burden-shifting regime that governs employment discrimination cases. See Conward, 171 F.3d at 19. The University has pointed to non-discriminatory reasons as to why Bhatti may not have been aware of the Center's extension of professional courtesy to the hygienists, and Bhatti has pointed to no evidence of actual bias or pretext. Specifically, the other hygienists learned of the Center's workplace policies from their supervisors when they were hired — well before Needham and Bhatti arrived. Bhatti learned of workplace policies and practices from Needham, who according to her deposition testimony knew nothing of the Center's practices regarding de minimis scheduling deviations. In fact, Needham says she was unaware of any hygienist leaving early without submitting a leave request. Once Bhatti learned of the courtesy extended to others, she raised the issue with Dr. Haidar, who immediately clarified that she, too, was entitled to this courtesy. Again, this uneven communication between administration personnel and between administration and staff certainly suggests some dysfunction in the Center's management, but it does not show bias.[14]

---

[14] Also notable on the issue of bias is the lack of testimony from Stefanie Charity, the other black hygienist. An employer's treatment of similarly situated workers can be evidence of bias, see Brown v. Trustees of Boston University, 891 F.2d 337, 349 (1st

These problems are dispositive: because there is no evidence in the record that Bhatti was ever actually denied a 10- to 15-minute early departure, such a nonexistent denial cannot support her discrimination claim. And beyond that, because she cannot show bias, the claim must fail anyway.

Bhatti's last discrimination claim stems from the Center's alleged failure to provide her with annual performance reviews before 2007. This claim falters because the record contains her annual performance reviews for the years 2004-2005, 2005-2006, 2006-2007, and 2007-2008.[15] Thus, there is only one missing performance review (2003-2004), and its absence is not materially adverse because Bhatti received a merit raise in 2004. Because the factual predicate for Bhatti's missing-performance-review claim turns out to be false, the claim fails.

On to retaliation. Bhatti claims that the University retaliated against her, primarily by issuing written warnings, in response to her complaints of race discrimination. To succeed on a retaliation claim, a plaintiff must show that her employer took some objectively and materially adverse action against her because she opposed a practice forbidden by Title VII, such as race discrimination. Burlington Northern & Santa Fe Ry. Co. v. White,

Cir. 1989), and the absence of any such evidence here is telling.

[15] Bhatti's reviews' date-ranges reflect academic rather than calendar years.

548 U.S. 53, 59, 68 (2006).  Bhatti claims that the reprimands she suffered at the hands of Needham and Dr. Haidar were materially adverse employment actions.

We have found before that a reprimand may constitute an adverse action, Billings v. Town of Grafton, 515 F.3d 39, 54-55 (1st Cir. 2008), but the reprimands at issue here are tamer beasts than the one in Billings.  Specifically, none of the reprimands here can be said to be material because none carried with it any tangible consequences.  Rather, each was merely directed at correcting some workplace behavior that management perceived as needing correction; her working conditions were never altered except in the positive direction.[16]  Bhatti may well be right that these reprimands were undeserved — indeed, she presents enough evidence that we may safely presume her to be blameless (or nearly so) in each instance for summary judgment purposes — but a criticism that carries with it no consequences is not materially adverse and therefore not actionable.  In the end, this means her retaliation claim fails as a matter of law.

Finally, Bhatti claims the University subjected her to a racially-motivated hostile work environment where (as outlined

---

[16] Far from suffering any actual adversity, Bhatti has received regular raises and a permanent workstation, and the most recent evidence shows that she receives generally positive comments on her performance reviews.  Moreover, when she raised a valid issue regarding the Center's sick leave policy, the University responded by crediting each hygienist with an additional 22 hours of leave.

above) she was subject to reprimand for the slightest misstep and regularly belittled and mistreated by her supervisors. To make out a prima facie case of a hostile work environment, Bhatti must point to evidence showing, inter alia, that facts and circumstances of her employment viewed objectively were so "severe," "pervasive," and "abusive" as to "alter the conditions" of her job. Vega-Colón v. Wyeth Pharmaceuticals, 625 F.3d 22, 32 (1st Cir. 2010) (internal quotation marks omitted). On this point, we must consider several factors, none of which is individually determinative: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (internal quotation marks omitted).

Bhatti cites several grounds for her hostile work environment claim: the requirement (belied by the record) that she work longer hours than her white counterparts, the unwritten rule about time off that applied to her coworkers but not to her, and Center management's selective enforcement of workplace rules against her in the form of critical memoranda. We have already held that, taken individually, none of these grounds amounts to an adverse employment action. Nevertheless, we must consider whether they amount to a hostile work environment in the aggregate.

The answer is no. The Center's conduct toward Bhatti was far from severe, never physically threatening, generally conducted in private so as not to be humiliating, and never overtly offensive; moreover, Bhatti has pointed to no effect whatsoever on her work performance. True, she sought psychological counseling, but this is evidence of subjective offense at best. Objectively, the Center's conduct here might have crossed the boundary from professional to unprofessional, but it never reached the level of abuse. And where a workplace objectively falls short of that "abusive" high-water-mark, it cannot sustain a hostile-work-environment claim.

The district court got this one right as a matter of both disposition and description: Bhatti has succeeded only in showing "a litany of petty insults, vindictive behavior, and angry recriminations." As these are not actionable, we uphold the district court's grant of summary judgment for the University on all claims.

**AFFIRMED.**