# United States Court of Appeals
## For the First Circuit

No. 20-1396

JEFFREY JOSEPH,

Plaintiff, Appellant,

v.

LINCARE, INC.,

Defendant, Appellee,

FAMILY PRACTICE ON THE RIVER, d/b/a Kennebunk Walk-In
Clinic, Inc.; PATRICK BUTCHER, individually; BRIGHTON MEDICAL
SERVICES, INC., d/b/a Kennebunk Walk-In Clinic, Inc.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Thompson and Kayatta,*
Circuit Judges.

James A. Clifford, with whom Andrew P. Cotter, and Clifford
& Clifford, LLC were on brief, for appellant.
Jeana M. McCormick, with whom Melissa A. Hewey, and Drummond
Woodsum were on brief, for appellee.

---

* Judge Torruella heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the panel's opinion. The remaining two panelists
therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

March 2, 2021

**KAYATTA, Circuit Judge.** Jeffrey M. Joseph appeals the district court's order excluding several documents as unauthenticated hearsay evidence and granting Lincare, Inc.'s motion for summary judgment rejecting Joseph's racial discrimination challenge to the termination of his employment. We agree with Joseph that the district court erred in excluding several documents from the summary judgment record. We also find that the record, thus supplemented, provides a reasonable basis for a jury finding in Joseph's favor. We therefore vacate the entry of summary judgment in favor of Lincare. Our reasoning follows.

## I.

### A.

We review a district court's grant of summary judgment de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor. Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). On January 18, 2017, Joseph, a then forty-six-year old black male originally from Dominica, began working with Lincare as a sales representative at its Falmouth, Maine location. Lincare is a supplier of respiratory-therapy products across the United States. As part of its business, Lincare works with various medical offices -- called "referral sources" -- to identify

patients who may be candidates for Lincare's products and services. Joseph's duties included "selling medical equipment, building relationships with referral sources, resolving complaints that referral sources had about Lincare, and obtaining . . . documentation" for insurance purposes. One of Lincare's previous referral sources was Family Practice on the River d/b/a Kennebunk Walk-In Clinic ("KWIC"). Prior to Joseph's employment, Lincare had serviced patients from KWIC, but the Lincare-KWIC relationship had deteriorated. During Joseph's employment, Lincare had not identified any new KWIC patients.

In early March 2017, Lincare instructed Joseph to go to KWIC. After that first visit, Joseph reported to Lincare that KWIC "did not want anything to do with Lincare, and that he didn't want to go back there." Lincare, however, instructed Joseph to return to KWIC on March 23, 2017. On that day, Joseph went to KWIC to secure a signature on a certificate of medical necessity for a KWIC patient whom Lincare still serviced. According to Joseph, in addition to obtaining the signature, he was also "expected to attempt to repair the relationship with [KWIC]." Upon arrival, a woman at the front desk advised Joseph that KWIC was no longer using Lincare's services. Joseph explained that Lincare was still serving one of KWIC's patients and that he needed a signature for insurance purposes. During this conversation,

-4-

Patrick Butcher, the owner of KWIC, interjected and advised Joseph that KWIC was no longer utilizing Lincare's services and that the patient's physician had no interest in speaking with Joseph. Undeterred, Joseph asked if he could set up a meeting with the physician, to which Butcher responded by repeating that KWIC was not utilizing Lincare and that the physician did not want to meet with Joseph. According to Joseph, at that point Butcher came out from behind the front-desk counter, got in Joseph's face and began yelling "get out, get out, get out." Butcher got so close to Joseph that Butcher's spit hit Joseph in the face. Joseph was nervous and scared, and told Butcher not to hit him.

After leaving KWIC, Joseph called Dennis Lizotte ("Lizotte"), his direct supervisor and Lincare's area manager. Joseph reported to Lizotte that Butcher had disrespected him and refused to sign the certificate of medical necessity, "that he felt Butcher discriminated against him based on his color," and that Joseph was so scared that he wanted to file a report with the police. Lizotte approved of Joseph's plan to file a police report and gave him directions to the Kennebunk Police Station, where Joseph filed an incident report that day. Rather than leaving it at that, Joseph of his own accord decided that it would be a good idea to call Butcher. The call did not go well. Joseph told Butcher that Butcher had been disrespectful to him, but that he

nonetheless wanted to fix the Lincare-KWIC relationship.[1] According to Joseph, Butcher "exploded" at him and told Joseph to "stop crying" and that he was going to have him fired. Butcher eventually hung up on Joseph. Still persisting, Joseph attempted several more times to get Butcher back on the phone, to no avail. Joseph admits making these repeated attempts to talk with Butcher after filing a complaint with the police. He explains that he was trying to repair Lincare's relationship with KWIC, and that no one told him not to do so.

Later that same day, Butcher contacted Lincare and spoke with Lizotte about his interactions with Joseph. When asking Lizotte whether Joseph worked for Lincare, Butcher provided a physical description of Joseph that made Lizotte feel "taken [a]back." According to Lizotte, Butcher asked him if Lincare employed a "rasta looking sales rep[resentative]."[2] Butcher,

---

[1] Butcher, in contrast, claims that Joseph threatened him on the phone.

[2] "Rasta" or "rastafarian" refers to an adherent of "Rastafarianism," which is "a religious movement among black Jamaicans that teaches the eventual redemption of blacks and their return to Africa, . . . forbids the cutting of hair, and venerates Haile Selassie[, the former Emperor of Ethiopia,] as a god." *Rastafarianism*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/Rastafarianism (last visited Feb. 23, 2021). "Rastafarians usually wear dreadlocks." Merriam-Webster Learner's Dictionary, https://www.learnersdictionary.com/definition/Rastafarian (last visited Feb. 23, 2021). Joseph wore dreadlocks.

instead, claims that he merely described Joseph as a "6'4["], thin, African American with what seemed to be a Jamaican accent." Lizotte responded by telling Butcher Joseph's name. Butcher complained to Lizotte that Joseph was "bothering his staff and ignoring the Clinic's patients" and demanded that Joseph be fired. Lizotte advised Butcher that he would not fire Joseph over the phone and that Lizotte needed to have a chance to speak with Joseph. Butcher responded that he would escalate the matter to Lincare's board of directors and its CEO. As matters thus stood, based on his conversations with Butcher and Joseph, Lizotte was not inclined to accede to Butcher's demand that Joseph be fired. In Lizotte's view, the events were out of character for Joseph, and not likely to be repeated.

Following through on his promise, that same day Butcher wrote a letter about the incident and sent it to eight executives at Lincare's headquarters. In his letter, Butcher identified Joseph by his full name and described him as "about 6 feet 4 inches, mid 30's African American with what seem[s] to be a Jamaican accent." Butcher stated in the letter that he would wait until March 31, 2017, for Lincare to respond, and threatened Lincare with "tak[ing] legal action, contact[ing] the media, etc." if Lincare did "not agree to some sort of mutually agreeable settlement."

The following Monday, March 27, 2017, Tarrah Filo-Loos ("Filo-Loos"), then a division manager for Lincare, contacted Butcher by phone to discuss his letter and the incident. Filo-Loos apologized to Butcher. After her conversation with Butcher, Filo-Loos contacted Lizotte and asked him why he had not fired Joseph. Lizotte explained why he did not believe Joseph would pose a continuing problem for Lincare in the future. Nevertheless, Filo-Loos secured Lizotte's agreement to terminate Joseph.

Lizotte later provided his own account of Joseph's termination. In his statement dated August 25, 2017, Lizotte stated that he did not terminate Joseph right "after the incident in the physician's office" because the "scenario was entirely out of character from what [Joseph] had exhibited since his time of hire" and Lizotte believed that it might have been "an overreaction." Lizotte claimed that when Filo-Loos called him to discuss the situation, and questioned Lizotte as to why he had not terminated Joseph, she gave him "new information" that caused him to agree with Filo-Loos about firing Joseph. That new information, he claimed, was that Joseph had contacted Butcher again after leaving. According to Lizotte, he "c[ould] deal with the initial interaction [at KWIC], but the poor judgment of harassing somebody after you've been asked to leave, that's why he

-8-

was terminated."  Butcher, though, had spoken with Lizotte before Lizotte spoke with Filo-Loos.  And Butcher testified that he told Lizotte about Joseph's callbacks.

Approximately five months after Joseph's firing, Filo-Loos sent a letter to Paula Adams ("Adams"), Lincare's Head of Employee Relations, in which she recounted the incident that led to Joseph's termination.  In her letter, Filo-Loos stated that, on March 27, 2017, she received a copy of Butcher's letter and, after discussing the situation with Lizotte, they decided that Joseph's "behavior could not be tolerated."  She further stated that if a sales representative is verbally attacked by "a physician or a member of the physician's staff," the sales representative "must remain professional[,] . . . excuse him or herself from the situation," and seek counsel from his or her supervisor.  According to Filo-Loos' letter, because Joseph "did not do that [and, instead,] he returned to the office after his supervisor told him not to," she decided that he should be terminated.  Both Joseph and Lizotte later testified, however, that Lizotte never told Joseph not to contact Butcher again.

When he was fired, Joseph was still in a ninety-day probationary period that Lincare imposes on all new employees -- a fact known to Adams.  Per the Lincare Handbook, any employee terminated within the ninety-day period is without recourse to

Lincare's "Problem Resolution Procedure or progressive steps of discipline." In an e-mail sent by Adams to Filo-Loos regarding Joseph's termination, Adams nevertheless stated, "[d]o need to give Mr. Joseph his proverbial 'day in court' and give him a chance to explain, defend, deny, etc." Adams further stated that perhaps Lizotte already gave Joseph a "chance to explain, but [that they needed to] confirm that with [Lizotte] . . . [to] be sure." Filo-Loos did not respond to Adams' e-mail, and Joseph did not have an opportunity to review Butcher's letter before his termination.

**B.**

On October 24, 2018, Joseph filed a complaint against Lincare in the United States District Court for the District of Maine.[3] In his amended complaint filed on the following day, Joseph asserted claims for: (1) intentional racial discrimination and retaliation under 42 U.S.C. § 1981; (2) racial discrimination and retaliation under the Maine Human Rights Act ("MHRA"), Me. Rev. Stat. Ann. tit. 5, §§ 4572, 4633; and (3) retaliation under Maine's Whistleblower Protection Act, Me. Rev. Stat. Ann. tit. 26, § 833.

---

[3] Joseph also brought claims against KWIC and Butcher, but he settled his claims against them.

Lincare eventually moved for summary judgment. In response, Joseph voluntarily dismissed his retaliation claims against Lincare, and opposed summary judgment as to his discrimination claims under Section 1981 and MHRA. In support of his opposition, Joseph submitted several documents that Lincare produced to Joseph during the discovery stage. Lincare requested that three of those documents be stricken from the summary judgment record as inadmissible unauthenticated evidence.

On October 22, 2019, the district court entered an opinion and order granting Lincare's motion for summary judgment. Joseph v. Lincare, Inc., No. 18-cv-00443-LEW, 2019 WL 5399494 (D. Me. Oct. 22, 2019). The district court ruled that the documents to which Lincare objected -- Filo-Loos' handwritten notes of a meeting she had with Lizotte on March 28, 2017, Filo-Loos' letter to Adams dated August 21, 2017, and the May 27, 2017, e-mail exchange between Filo-Loos and Adams -- constituted inadmissible "unauthenticated and hearsay evidence." See id. at *3 nn.2-3. Hence, it excluded these documents from the summary judgment record. Id. The court additionally excluded on the same grounds a fourth document -- Lizotte's statement to Adams dated August 25, 2017 -- to which Lincare had not objected. Id. at *3 n.3.

The district court then analyzed Joseph's racial discrimination claims under Section 1981 and the MHRA. Id. at *3. Applying the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the district court found that Joseph had made out a prima facie case of racial discrimination. Joseph, 2019 WL 5399494, at *4-6. The court rejected Lincare's arguments that Joseph was not qualified for his job and that there was no evidence of a causal connection between Joseph's race and his termination. Id. at *5-6. Specifically, the court found that whether Joseph violated Lincare's policies during his interaction with a former client was in dispute and that "there [was] at least as much evidence suggesting he met or exceeded Lincare's employment expectations overall." Id. at *5. Likewise, it found that Joseph had satisfied the causation prong by presenting "some evidence that his termination might have been racially motivated." Id. at *6.

The district court then examined whether Lincare had articulated a "legitimate, non-discriminatory reason for terminating" Joseph. Id. The district court took the view that after Filo-Loos and Lizotte "review[ed] the incident" they both agreed to terminate Joseph for "unprofessional and potentially harassing behavior" arising out of the incident at KWIC. Id. The district court found that Lincare's proffered reason was non-

-12-

discriminatory and sufficient to satisfy the second prong of McDonnell Douglas, thus shifting the burden back to Joseph.  Id.

Finally, the district court found that Joseph had failed to provide any admissible evidence showing that Lincare's articulated reason was pretextual.  Id. at *7.  Joseph had argued that Lincare's stated rationale for firing him was pretextual because (1) Lincare's articulated reasons for firing him changed over time and were "inconsistent and irreconcilable" and (2) Joseph did not receive his "proverbial 'day in court'" that was offered to other Lincare employees before termination.  Id. Considering the record culled of the stricken documents, the district court rejected those arguments.  Id.

First, the district court found that Lincare's proffered reasons for terminating Joseph were "related and overlapping" rather than inconsistent or contradictory.  Id.  In the court's view, "[t]he record suggest[ed] that two aspects of Mr. Joseph's behavior both contributed to [Lincare]'s decision to fire him: he out-stayed his welcome at [KWIC] on March 23, and continued to call [KWIC] later that day after having been unequivocally turned away by Mr. Butcher."  Id.  The district court explained that the fact that Lincare "states these rationales differently in the record, and at different times, is not evidence of pretext, but

-13-

evidence that there were multiple factors contributing to the decision to terminate" Joseph. Id.

Second, the district court found no basis to infer bias because Lincare failed to give Joseph his "proverbial day in court." Id. The district court observed that Joseph was still within his ninety-day "trial period" with Lincare during which Lincare's normal "Problem Resolution Procedure" did not apply. Id. The district court also noted Joseph's purported failure to show that any other employees within Lincare's ninety-day trial window ever received more procedure or process prior to termination. Id. In the district court's view, the evidence "point[ed] to this being a typical, routine firing of an employee during the 90-day trial period, and [did] not imply Lincare's stated reasons for firing Mr. Joseph were pretextual in any way." Id. To the contrary, the district court found "that there was nothing extraordinary about his termination" at all. Id. Therefore, the court dismissed Joseph's racial discrimination claims. Id. at *8. Joseph timely appealed.

**II.**

**A.**

We consider first whether the summary judgment record should include the documents stricken as "unauthenticated and hearsay evidence." Id. at *3 n.3. Each document on its face

-14-

purports to have been authored by and retained by Lincare employees in the ordinary course of their work for Lincare. The parties therefore agree on appeal that the documents are not excludable as hearsay. So we limit our discussion to the authenticity issue.

"[We] review the district court's evidentiary rulings made as part of its decision on summary judgment for abuse of discretion." Hoffman v. Applicators Sales & Serv., Inc., 439 F.3d 9, 13 (1st Cir. 2006). Although this is a deferential standard, it "does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 572 U.S. 559, 563 n.2 (2014) (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990)).

Both the district court and the parties take the position that Rule 56 of the Federal Rules of Civil Procedure, which provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), requires the parties to cite materials that would be admissible at trial. Accordingly, they agree that the evidence must be authenticated. We need not pass judgment on the correctness of their

interpretation of Rule 56's admissibility requirement, which has not been briefed by the parties.[4]  Instead, we focus on their point of disagreement -- whether the excluded evidence was sufficiently authenticated.

Rule 901 of the Federal Rules of Evidence provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  In section (b), the rule identifies examples of ways to authenticate evidence, including through testimony of a witness with knowledge.  Fed. R. Evid. 901(b)(1).  Thus, "[a] document can be authenticated [under Rule 901(b)(1)] by

---

[4]  Compare G. v. Fay Sch., 931 F.3d 1, 14 (1st Cir. 2019) (stating that documents that are "unauthenticated" are "inadmissible at the summary judgment stage" (citing Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000))); and Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) (noting that "'[i]t is black-letter law that hearsay evidence cannot be considered on summary judgment' for the truth of the matter asserted" (quoting Dávila v. Corporación de P.R. Para La Difusión Pública, 498 F.3d 9, 17 (1st Cir. 2007))); with Maurer v. Indep. Town, 870 F.3d 380, 384 (5th Cir. 2017) (noting that, after the 2010 amendment to Rule 56, all that must be shown is that the evidence "be capable" of authentication at trial); Jones v. UPS Ground Freight, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (holding that district court may consider hearsay on motion for summary judgment "if the statement could be reduced to admissible evidence at trial or reduced to admissible form" (quoting Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999))).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

a witness who wrote it, signed it, used it, or saw others do so." United States v. Landrón-Class, 696 F.3d 62, 69 (1st Cir. 2012) (alterations in original) (quoting Orr v. Bank of Am., NT & SA, 285 F.3d 764, 774 n.8 (9th Cir. 2002)).

## 1.

We consider first Lizotte's written statement to Adams dated August 25, 2017. Lincare had specifically conceded in the district court that this evidence was "admissible" and "could be considered" by the district court in ruling on Lincare's motion for summary judgment. Reply of Def. in Supp. of Mot. for Summ. J. at 5, Joseph, No. 2:18-cv-00443-LEW (D. Me. Oct. 7, 2019), ECF No. 52. Furthermore, the document's authenticity was independently established during Lizotte's deposition, where he testified that he had authored the statement at Adams' request, and discussed its content. See Fed. R. Evid. 901(b)(1) (testimony by a witness with knowledge that the item is what it purports to be satisfies the requirement of authentication); see also Landrón-Class, 696 F.3d at 69.

## 2.

Joseph's counsel acquired the remaining three documents as a result of discovery requests asking Lincare why it fired Joseph, what role Filo-Loos had in responding to Butcher's letter, and why she believed Joseph had been insubordinate. In response,

-17-

Lincare referred to documents that its counsel provided, which included those three documents. One document is on Lincare letterhead, a second is a printout from the email system with the Lincare logo, and the third consists of handwritten notes captioned "Notes of Tarrah Filo Loos from conversation with Dennis Lizotte, Area Manager." In producing these documents, Lincare offered no caveat suggesting they might be other than what they appear to be. To this day, Lincare has never claimed they are not authentic.

Discovery is expensive enough without adding make-work. When a party in response to discovery requests points to a document that appears on its face to be a business record of the producing party, the other parties should be able to treat the document as authentic unless someone offers some reason to think otherwise, before it is too late to do something about it. See McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 562 (5th Cir. 1998) (finding that district court did not abuse its discretion in finding a document authenticated on the basis that "(1) [the plaintiff] produced the document in response to a discovery request, (2) the document bore her signature, [and] (3) she did not claim that the document [was] not authentic or that her signature [was] a forgery"); McQueeney v. Wilmington Tr. Co., 779 F.2d 916, 929-30 (3d Cir. 1985) (finding "the fact that the copies were produced by the plaintiff in answer to an explicit discovery

request . . . while not dispositive on the issue of authentication, is surely probative" and concluding that challenged documents were authentic because of the "sum of . . . circumstantial evidence").

Here, when Joseph sought to use the documents as being what they appeared to be, Lincare never offered any suggestion that it had produced unauthentic documents. Rather, it simply played "gotcha," waiting until discovery was over to challenge authenticity by arguing that Joseph had failed to obtain an express admission of authentication by Lincare of its employees who created the documents. In rewarding this gambit, the district court erred. As we shall explain, this evidentiary error was not harmless because these documents help push Joseph's case over the summary judgment hurdle.

**B.**

**1.**

Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

"Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law.'" Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The party opposing summary judgment bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).

Joseph brings racial discrimination claims under both Section 1981 and MHRA. Section 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). In turn, MHRA provides that "[i]t is unlawful employment discrimination . . . [f]or any employer . . . to discharge an employee or discriminate with respect to . . . any other matter directly or indirectly related to employment . . . because of their race or color." Me. Rev. Stat. Ann. tit. 5, § 4572(1)(A).

Where, as here, a plaintiff opposing summary judgment does not have direct evidence of discrimination, we apply the burden-shifting framework outlined in McDonnell Douglas Corp., 411 U.S. at 802-05, which has been adopted for both Section 1981 and MHRA employment discrimination cases. See Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 70 (1st Cir. 2011) (applying the McDonnell

-20-

Douglas framework to Section 1981 cases); Bishop v. Bell Atl. Corp., 299 F.3d 53, 58 n.3 (1st Cir. 2002) (noting that "[t]he Supreme Court of Maine explicitly adopted the McDonnell Douglas framework as applied to employment discrimination claims brought under the MHRA" (citing Me. Hum. Rts. Comm'n v. City of Auburn, 408 A.2d 1253, 1261-63 (Me. 1979))).

Under the McDonnell Douglas framework, a plaintiff has the initial burden of establishing a prima facie case by showing: (1) membership in a protected class; (2) he met his employer's expectations; (3) he suffered an adverse employment action; and (4) evidence of a causal connection between his membership in a protected class and the adverse employment action. Bhatti, 659 F.3d at 70; Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008); McDonnell Douglas Corp., 411 U.S. at 802. "This burden is not onerous." Caraballo-Caraballo v. Corr. Admin., 892 F.3d 53, 57 (1st Cir. 2018).

If the plaintiff establishes his prima facie case, "the burden of production -- but not the burden of persuasion -- shifts to [the employer], who must articulate a legitimate, nondiscriminatory reason" for its action. Theidon v. Harvard Univ., 948 F.3d 477, 495 (1st Cir. 2020) (quoting Johnson v. Univ. of P.R., 714 F.3d 48, 53-54 (1st Cir. 2013)); see also McDonnell Douglas Corp., 411 U.S. at 802. If the employer articulates such

a reason, the burden shifts back to the plaintiff, who must then offer evidence sufficient to support a finding that it is more likely than not that the employer's proffered reason for the adverse employment action was pretextual and that the true reason was unlawful discrimination. McDonnell Douglas Corp., 411 U.S. at 804-05.

## 2.

The district court found that Joseph made out a prima facie racial discrimination claim, and that Lincare had articulated a legitimate, non-discriminatory reason for his termination, namely, Joseph's marked persistence in continuing to contact Butcher even after it was clear that such contacts were vigorously unwelcome. The parties do not dispute these findings on appeal.[5] Instead, they dispute whether the district court erred

---

[5] Although Joseph does not challenge the district court's finding that he successfully established a prima facie case of racial discrimination, he argues the district court should have denied summary judgment at the first step of the McDonnell Douglas framework because the parties disputed several facts relevant to the prima facie case. His argument is a non-starter. Joseph cannot defeat summary judgment merely by showing that there were disputed issues of fact as to the elements of the prima facie case. If a plaintiff cannot establish a prima facie case of discrimination, summary judgment is appropriate. Likewise, if there are material issues of fact as to the elements of the prima facie case, but the employer articulates a legitimate, non-discriminatory reason for the adverse employment action and the plaintiff fails to show pretext, summary judgment is also appropriate. For those reasons, courts frequently assume, favorably to plaintiffs, that a prima facie case of discrimination has been established and move on to remaining steps of the

in concluding that Joseph failed to meet his burden, under the third step of the McDonnell Douglas framework, to produce evidence creating a genuine issue of fact as to whether: (1) Lincare's articulated reason for his termination was pretextual and (2) racial discrimination was the real reason for his termination. See Quinones v. Buick, 436 F.3d 284, 290 (1st Cir. 2006); Villanueva v. Wellesley Coll., 930 F.2d 124, 128 (1st Cir. 1991) (explaining that in addition to showing a genuine dispute of material fact as to whether the employer's articulated reason is pretextual, the plaintiff must point to "evidence from which a reasonable inference of discrimination can be drawn").  A plaintiff may "use the same evidence to show both pretext and discriminatory motive, 'provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.'"  Pina v. Children's Place, 740 F.3d 785, 797 (1st Cir. 2014) (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000)).

Racial animus first arose, according to Joseph, in the form of Butcher's antagonism.  Joseph points to the vituperative

McDonnell Douglas framework.  See, e.g., Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 47 (1st Cir. 2019) (sanctioning the practice of assuming the plaintiff has established a prima facie case and moving on to the remaining steps of the McDonnell Douglas framework).

nature of Butcher's confrontation and Butcher's express references to Joseph's race. The second reference, unlike the first, came after Butcher knew Joseph's name so it might reasonably be regarded as suggesting that Butcher's reaction to Joseph may have rested in part on a racist view of blacks as threatening. Additionally, such an inference could be reasonably viewed as reinforced by the unusually antagonistic nature of Butcher's behavior (at least as described by Joseph). So, were the issue in this case whether a jury could find that racial bias was a factor in Butcher's complaints regarding Joseph, we would likely say yes.

But Joseph lodges his complaint against his employer, Lincare, not Butcher. He also disavows any effort to extend any so-called cat's paw theory to the facts here.[6] Nor does he claim that we should look to the precedent applicable when an indifferent employer knowingly accedes to racist customer preferences. See, e.g., Chaney v. Plainfield Healthcare Ctr., 612 F.3d 908, 913 (7th Cir. 2010). And he more broadly disclaims any argument that Butcher's assumed bias should be imputed to Lincare. Rather, he argues that Lincare itself acted with bias when it "agree[d] with

---

[6] See, e.g., Staub v. Proctor Hosp., 562 U.S. 411, 415, 422-23 (2011) (explaining that an employer can be liable for a supervisor's biased review of an employee even if the person taking adverse action based on that review is unaware of the bias).

-24-

Butcher's racially hostile perspective" that "a 6'4" black man with an accent is someone to fear."

So we turn our attention to Lincare. Joseph admittedly has no direct evidence of any racial animus by Lincare. Presumably, aware of his race, the company hired him and all went without a hitch until the visit to KWIC. The only reference to race, direct or otherwise, by any Lincare employee is Lizotte's statement that he was "taken [a]back" by Butcher's reference to Joseph's race.

The law, though, allows a plaintiff to prove a claim of race discrimination with circumstantial evidence, including reasonable inferences that might be drawn from that evidence. Thomas v. Eastman Kodak Co., 183 F.3d 38, 58 (1st Cir. 1999) (noting that the McDonnell Douglas framework was designed to allow plaintiffs to prove discrimination by circumstantial evidence); Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 171 n.13 (1st Cir. 1998). Toward that end, Joseph points to inconsistencies in the explanations given by Lincare for firing Joseph.

Lincare officials have offered at divers times the following explanations: Joseph did not know when to leave KWIC; Joseph acted unprofessional at KWIC; Joseph exercised poor judgment in repeatedly calling back Butcher; Joseph went back to

KWIC; and Joseph disobeyed an order from Lizotte not to contact Butcher again.

The district court concluded that these various rationales for the termination were "related and overlapping" rather than "inconsistent" or "contradictory." But Joseph's point is that based on his and Lizotte's testimony, jurors could find at least three of the reasons given for his termination to be false because: (1) He did not go back to KWIC; (2) he did not act unprofessionally when first there; and (3) Lizotte never told him not to contact Butcher again.

An employer's changing explanations for an adverse employment action can sometimes provide evidence of pretext. See Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 431-32 (1st Cir. 2000) ("[W]hen a company, at different times, gives different and arguably inconsistent explanations [for an employee's termination], a jury may infer that the articulated reasons are pretextual."). Furthermore, depending on their materiality, "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" may also allow "a factfinder [to] infer that the employer did not act for the asserted non-discriminatory reasons." Pina, 740 F.3d at 797 (quoting Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 42 (1st Cir. 2001)). However, the

falsity of an employer's proffered reason for a discharge does not automatically generate a sufficient inference that the real reason must be discriminatory animus. As we explained, "it is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." Theidon, 948 F.3d at 497 (alteration in original) (quoting Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009)). If, for example, Joseph had punched a customer once, no one would think his discharge discriminatory merely because Lincare claimed he punched the customer twice. Further, a false justification is no sham at all unless the employer knows it to be false. Vélez, 585 F.3d at 452.

With these principles in mind, we turn to the three falsehoods that Joseph claims are contained in Lincare's explanations for his termination. As we will explain, we find the first two claimed falsehoods to provide examples of the types of assertions that in context do not by themselves generate a reasonable inference of discrimination bias even if false.

The first of the three is too immaterial to generate sufficient inferential force supporting a finding of discriminatory motive -- whether Joseph went back to KWIC or

instead called back repeatedly, the salient and undisputed point is that he initiated plainly unwelcome and imprudent contact. The second alleged falsehood also falls short of the mark: It concerns a fairly debatable characterization that is not so implausible as to imply knowing falsity.

The last falsehood is a different matter. The claim that Joseph disobeyed a direct order by contacting Butcher after the first encounter is a statement of fact rather than a characterization or an opinion. A jury could find it very material, given that it could find that Lizotte -- who said it was false -- did not lean towards firing Joseph. Most importantly, Lincare cannot claim that this false accusation of insubordination was a result of a momentary misunderstanding arising from confusion at the time events occurred. Rather, Lincare included this reason in its sworn interrogatory answer in this lawsuit dressed up as a formal charge of insubordination even as it presumably knew that Lizotte denied giving Joseph any such order. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006) ("[A] court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible.") (citation and quotations omitted). Jurors could reasonably suspect that Lincare would not have gone to such lengths unless it had qualms

about whether Joseph's actual conduct would normally result in the termination of an otherwise well-performing new employee.

In assessing whether a suspicion of that type can support a verdict of discrimination, we need examine the "aggregate package of proof offered by the plaintiff." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991). That proof also includes a plausible suggestion that Filo-Loos rushed to judgment when she presumed Joseph should be fired when all she had was unverified accusations that a tall black employee was intimidating Butcher. In overbearing Lizotte's view to the contrary, and in rejecting the suggestion that she give Joseph a chance to respond, Filo-Loos could be seen as accepting too readily a portrayal of a tall black employee as threatening. Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 29 (1st Cir. 1998) (finding that evidence that the employer had not followed its standard procedure for laying off employees during reduction in force was "directly relevant to [laid-off employee's] burden of demonstrating pretext").

None of this is to say that Filo-Loos or Lincare acted in a discriminatory manner. Much evidence suggests to the contrary. Our task at this point is not to decide whether Joseph's firing was on account of his race. Rather, we rule only that he has just enough evidence, as supplemented by the improperly excluded documents, to warrant a trial.

### III.  <u>Conclusion</u>

We <u>reverse</u> the challenged evidentiary ruling, <u>vacate</u> the district court's entry of summary judgment in Lincare's favor, and <u>remand</u> for further proceedings consistent with this opinion. Costs are awarded to the appellant.