# United States Court of Appeals

## For the First Circuit

No. 20-1434

GERALD ALSTON,

Plaintiff, Appellant,

v.

INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 950,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch and Selya, Circuit Judges,
and Laplante,* District Judge.

Brooks A. Ames, with whom Brookline Justice League was on brief, for appellant.
John M. Becker, with whom James Racine and Sandulli Grace, P.C. were on brief, for appellee.

May 19, 2021

---

* Of the District of New Hampshire, sitting by designation.

**SELYA**, **Circuit Judge**.  Plaintiff-appellant Gerald Alston's supervisor left him a voicemail containing the most inflammatory of racial slurs.  The message triggered a lengthy series of events that Alston says culminated in his firing six years later.  Alston did not go quietly into this bleak night but, rather, sued in the federal district court alleging, inter alia, violations of 42 U.S.C. §§ 1981, 1983, and 1985.  The operative complaint names as defendants the Town of Brookline, Massachusetts (the Town), the Brookline Board of Selectmen (the Board), select members of the Board, the Town's counsel and human resources director, Local 950, International Association of Firefighters (the Union), and a Town Meeting member (Stanley Spiegel).  In resolving these myriad claims, the district court first dismissed with prejudice the claims against Spiegel.  See Alston v. Town of Brookline, No. 15-13987, 2017 WL 1536213, *1 (D. Mass. Apr. 26, 2017).  It then dismissed the claims against a Selectwoman, Jesse Mermell, in an unpublished order.  See Alston v. Town of Brookline, No. 15-13987, 2018 WL 3302995, at *2 n.1 (D. Mass. July 5, 2018).  Following extensive discovery, the court granted summary judgment, by means of two successive rescripts, in favor of the other defendants.  See Alston v. Town of Brookline, No. 15-13987, 2020 WL 1649915 (D. Mass. Apr. 2, 2020) (addressing motions by the Town, the Board, and the remaining individual defendants); Alston v.

- 2 -

Town of Brookline, No. 15-13987, 2020 WL 1615408 (D. Mass. Apr. 2, 2020) (addressing the Union's motion).

Alston filed a single notice of appeal, challenging all of these orders (save for the order dismissing the claims against Mermell). After hearing oral argument, we chose to decide the appeal in serial opinions. First, we affirmed the district court's dismissal of Alston's claims against Spiegel. See Alston v. Spiegel, 988 F.3d 564 (1st Cir. 2021). Next, we reviewed the district court's entry of summary judgment in favor of the Town, the Board, and the remaining individual defendants, vacating and remanding as to some claims and affirming as to others. See Alston v. Brookline (Alston/Town), ___ F.3d ___, ___ (1st Cir. 2021) [No. 20-1434, slip op. at 4]. In this final opinion, we address the district court's grant of summary judgment to the Union. Concluding — as did the district court — that the record reveals no genuine issue of material fact and that the Union is entitled to judgment as a matter of law, we affirm.

## I. BACKGROUND

We rehearse the relevant facts and travel of the case, focusing primarily on Alston's interactions with the Union. The reader who hungers for a more panoramic view may consult our earlier opinion in Alston/Town, ___ F.3d at ___ - ___ [No. 20-1434, slip op. at 4-18].

Alston, a black man, began working for the Brookline Fire Department (the Department) as a firefighter in 2002. Shortly thereafter, he became a member of the Union, which represents all firefighter personnel employed by the Town, excepting only the fire chief, the chief of operations, and the civilian staff.

During the spring of 2010, Alston sustained a work-related injury that temporarily put him out of work. On May 30, 2010, Paul Pender, then a lieutenant in the Department and Alston's supervisor, called Alston to check on his well-being. When Alston did not answer, Pender left a voicemail, which concluded with Pender using a racial slur ("f.....g n....r"), apparently in reference to Alston. After consultation with fellow firefighters, he concluded that he ought to reach out to Pender.

Pender, however, beat him to the punch and called him on July 8. He attempted to assure Alston that the racial slur was not intended for him. Instead, it was intended for "a young black gang-banger" who had cut off Pender in traffic. Offended by Pender's explanation, Alston abruptly ended the call.

Two days later, Pender again tried to explain the context in which he had uttered the racial slur. By then, Alston had spoken about the voicemail with Michael O'Reilly, the Department's chief of operations. Pender stated that reporting the voicemail to O'Reilly "was the stupidest thing [Alston] could have ever done." He then asked Alston, "Are you after my job or something?"

- 4 -

Alston filed a written complaint with then-Chief Peter Skerry on July 28. On July 30, Skerry determined that Pender's language constituted a fireable offense and transferred Pender to another station. Disciplinary proceedings took place the next month. At Pender's request, the Union provided him with legal representation. After determining that the racial slur may not have been directed at Alston, the Board imposed a negotiated two-tour suspension. Along with the suspension, Pender made certain other concessions: he waived his right of appeal, committed to undergo anger management and diversity training, agreed to mediation with Alston, and consented to transfer permanently out of the station where Alston worked.

Approximately two weeks after the effective date of Pender's suspension, the Town promoted Pender to temporary fire captain. In doing so, the Town used Pender's greater seniority to break a tie with then-Union President Shaun Fay, citing past practice. Fay did not appeal the Town's decision to promote Pender to the vacancy. Nor did he ask the Union to file a grievance regarding the Town's selection of Pender.

On September 17 (in anticipation of Alston's post-injury return to work), Chief Skerry met with the Department's officers. He reminded them that the Town has zero tolerance for either discrimination or retaliation. A week after that meeting, Pender was given a medal at the White House for his heroism in connection

with a 2008 fire.  Two days after Alston's return to work, Joe Canney, a fellow firefighter and Union member, wrote on a password-protected Union blog, to which only Union members had access, a reference to a "faceless coward" who was marring Pender's receipt of the award.  The post complained about someone "leak[ing] to the media about our BROTHER[']S alleged acts of misconduct on what should have been the proudest day of their professional lives."  Because a news report about Alston's complaint against Pender had recently been published, Alston put two and two together and understood Joe Canney to be speaking about him.  Alston complained to Skerry, who responded that he would request deletion of the post.  That post was subsequently deleted.

The parties dispute whether Joe Canney was a Union officer at the time he posted to the blog.  Alston points to the Union's 2010 tax filings, which list him as its vice-president.  But Paul Trahon, the Union President since 2013, testified that the tax filings were inaccurate.  Consistent with his testimony, Union meeting minutes from this period list Paul Canney — not Joe Canney — as one of the Union's officers.  The tax filings make clear that the two Canneys are separate individuals.

On November 24, Alston became agitated at work in the wake of a "routine scheduling decision."  Taken to a local hospital, he tested positive for cocaine.

Read in the light most favorable to Alston, see Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 2021), the record reflects that, in February of 2011, Pender again berated Alston for reporting the voicemail. Pender allegedly told Alston that he had "destroyed [Pender's] life and ruined [Pender's] career."

Alston was injured in a motor vehicle accident in May of 2012. That month, Alston filed a charge of discrimination with the Massachusetts Commission Against Discrimination (MCAD). In November, he amended the charge to incorporate a claim for retaliation. Specifically, he alleged that he had been "shunned, isolated, and mocked by his fellow firefighters at the direction and instruction of his superiors," that these conditions had been growing worse over the past three years, and that he had repeatedly complained about his plight without any intervention by management. Spurred by Alston's charge, the Town human resources director, Sandra DeBow, launched an investigation. She ultimately concluded that Alston's allegations were without merit.

Alston never complained to then-Union president Fay about any instance of retaliation or about being ignored by other firefighters. Nevertheless — as 2012 drew to a close — Fay learned that Alston had alleged that his coworkers were retaliating against him by ignoring him. Fay questioned Alston's group about the

charge, and the members of the group denied that any form of "shunning" was taking place.

On January 4, 2013, Lieutenant Ronald Cronin wrote to the new fire chief Paul Ford requesting that Alston be transferred back to his assigned engine. The stated purpose of this request was to keep Alston either on "street level" or with Lieutenant Justin Robinson at all times in order "to help ensure his own personal safety." In the letter, Cronin referenced his meeting with the chief and Lieutenant Robinson but made no mention of any Union official. And although Trahon did not see this letter until 2018, he testified that he spoke with Robinson around the time of Cronin's request about "dealing with management" and complying with the Collective Bargaining Agreement (the CBA).

In May 2013, Chief Ford recommended Pender's permanent promotion to the rank of captain. The Board acquiesced. By then, Alston says that he had noticed that firefighters were shunning him, ignoring him, leaving the common areas as soon as he entered, and leaving him out of family social events (to which he previously had been invited). And since Alston was no longer in attendance at Union events, the Union stopped asking him to sing the national anthem at those events. So, too, the record contains evidence showing that Pender took advantage of his new position to tell recruits that Alston's lawsuit was "a bunch of lies." Pender's account differs: he testified that he talked with five recruits

"who were all minorities" and that all of them were "shocked . . . that something so benign is going on seven and a half years later."

On June 17, Alston filed suit in a state court on his MCAD charge. When his state-court suit became public, the Town's counsel (Joslin Murphy) reminded Pender of his non-retaliation obligations.

It is undisputed that Alston and Pender had a conversation on October 31, 2013. Viewing that incident in the light most favorable to Alston, see Houlton Citizens' Coal., 175 F.3d at 184, he approached Pender, saying that his lawsuit was not personal and had nothing to do with Pender. The lawsuit, he said, was about the Town respecting him. Pender again apologized for the voicemail message but continued to admonish Alston, stating that the lawsuit was dragging his name through the mud and causing pain to his family. He also declared that the allegations in the complaint were lies.

At the end of his shift on December 19, Alston found the word "Leave" written in the dust on the door next to the seat on the firetruck to which he had been assigned. He called this display to the attention of two coworkers, Ryan Monahan and Cormac Dowling. Chief Ford was informed of the incident, and he reported it to both DeBow and Murphy. Three days later, Alston referred to the incident in front of coworkers and stated that, "people go

postal over matters like this."  That night, Ford interviewed Alston about his statement and — concerned about Alston's mental state — placed him on paid leave pending a psychiatric evaluation. From that point forward, Alston never resumed work as a firefighter.

Chief Ford immediately arranged to meet with DeBow and Murphy, relating that Alston had spoken to him about the incident in a "cordial and calm manner."  In his view, Alston was not a threat to his coworkers, and Chief Ford saw no need for the issuance of a "stay-away order."  Moreover, both Monahan and Dowling said that they did not feel threatened by Alston's comment. Another firefighter recalled Alston saying that he was not the type of person who would carry out a workplace shooting.

By then, Trahon had replaced Fay as Union President. Trahon heard about the "Leave" incident and Alston's subsequent comments from Lieutenant Robinson.  Trahon reached out to Chief Ford to gather more information.  When Ford asked Trahon for advice, Trahon commented that some unnamed Union members had expressed concern for their safety.  As a result, Trahon proposed stationing a police cruiser at Station 5.  After obtaining additional information, Trahon suggested assigning policemen to all the fire stations.  Ford asked Trahon if he was "insane" and rejected Trahon's suggestion.  Instead, on December 27, acting at the direction of the Town's hierarchs, Ford ordered Alston to stay

off the Town's property due to the "going postal" comment. Alston's later attempt to clarify that he had never made a comment about shooting the men in the station was ignored.

The Town soon circulated a flyer to its police officers. The flyer included a color photograph of Alston and the type of car he drove, listing his name, address, date of birth, and height. It claimed that Alston had "made statements referring to 'going postal,' obtaining a firearm and returning to a firehouse to cause harm." There is no evidence in the record to substantiate the allegations in the flyer beyond the "going postal" comment. The flyer was not distributed to firefighters, nor did the Town send it to the Union.

In an attempt to obtain more information about the Town's investigation into the "Leave" incident and Alston's employment status, Trahon contacted DeBow. According to Trahon, DeBow was "not forthcoming" but seemed "surprised" by how much Trahon knew. On January 3, 2014, Trahon sent a follow-up letter to the Town asking for information about the Town's investigation into the "Leave" incident, Alston's "threat level," the stay-away order, Alston's status as an employee, and any assistance offered to Alston. Trahon requested daily written updates. There is no evidence that the Town complied with Trahon's request.

On January 13, DeBow notified Alston that she was investigating both the "Leave" incident and the "going postal"

- 11 -

comments as possible violations of Town policies.  She also confirmed that he had been placed on paid leave pending completion of those investigations.  On May 14, DeBow reported that she could not conclude that the "Leave" message was discriminatory or retaliatory.  That same day, the Town scheduled a meeting to discuss the results of the Town's investigations, disciplinary action against Alston, and return-to-work conditions.

Alston did not seek to have the Union represent him at the meeting.  When Trahon learned that such a meeting would take place, he reached out to Alston to ask if he wanted representation.  Alston responded that he did but noted that he would have his attorney present as well.  Neither Alston nor the Town sent Trahon relevant correspondence or documentation prior to the meeting.

Alston and his attorney attended the meeting.  Prior to the start of the proceedings, DeBow told Trahon that he was allowed to be there only as an observer.  Town officials reported the results of the Town's investigations, including recommendations for discipline.  Trahon did not object at any point during the meeting.  And although Trahon testified that Alston accepted the Town's recommendations, Alston recalls objecting to the terms of the Town's proposal.  Notwithstanding his opposition to the Town's proposed terms, though, Alston never asked the Union either to lodge a grievance on his behalf or to take any other steps to oppose the Town's return-to-work conditions.  Alston never asked

the Union for additional representation, nor did he furnish the Union with any relevant documents.

The Town suspended Alston for two tours for violating its workplace safety policy. It also removed him from paid administrative leave and placed him on paid sick leave. After mental health evaluations by both Dr. Andrew Brown (a Town-designated psychiatrist) and Dr. Michael Kahn (Alston's designee), Alston's eventual return to work was conditioned on receipt of appropriate mental health treatment, reevaluation by the Town's psychiatrist, and random drug testing.

The Town and the Department tried to schedule meetings with Alston to explore whether he could return to work with reasonable accommodations. After plans for a meeting in November fizzled, DeBow notified Alston of a scheduled reevaluation with Dr. Brown.

Alston's counsel responded that Alston would not keep the scheduled appointment, but Trahon was not privy to that correspondence. Trahon did learn — in November of 2014 — that the Town was planning to conduct the scheduled fitness-for-duty evaluation at the public safety building. The Union took the position that such a public evaluation contravened the CBA. Although Alston did not request the Union's assistance on this issue, Trahon called DeBow to object to the evaluation. DeBow hung up on him. Trahon then wrote to the Town on December 2,

stating that the Union was "adamantly against" the Town conducting any evaluation at fire headquarters. Trahon feared that "parad[ing] a veteran firefighter through" any public building would set a "bad precedent for the entire membership" of the Union. He added that he believed the Union had blocked an earlier attempt by the Town to conduct a medical evaluation of a Union member in a public building. Those kinds of evaluations, Trahon said, posed a "serious problem for the Union."

Alston fell behind in his Union dues and — on December 12 — the Union gave him options either for catching up on his dues or temporarily withdrawing from Union membership. Alston did not respond. By failing to pay dues, he became a member not in good standing. Nevertheless, he was neither removed nor expelled from the Union; he always had the option of returning to full Union membership upon payment of back dues.

Trahon's complaint about the proposed reevaluation fell on deaf ears. Thus, in February of 2015, Alston underwent a fitness-for-duty examination by Dr. Marilyn Price, a Town-retained psychiatrist (designated as such after Alston had demanded that the Town replace Dr. Brown). The next day, Alston was placed on paid leave (apparently as a reward for his cooperation). Dr. Price concluded that Alston could return to work as long as he committed to appropriate treatment and the Town implemented satisfactory stress-reducing accommodations. She recommended three specific

conditions: that Alston receive appropriate mental health treatment; that Alston undergo random drug screens; and that the Town work with Alston to identify accommodations to reduce his level of stress. Even so, Alston and the Town failed to agree on a return-to-work plan.

On December 1, 2015, Joe Canney wrote an email to DeBow about Alston's situation. He complained that "[d]espite the fact that Mr. Alston threatened to shoot his co-workers, he continued to be payed [sic] for longer than most can even remember." Trahon was copied on this email, but there is no evidence that either he or DeBow replied to it.

In February of 2016, Murphy requested proof of mental health treatment and instructed Alston to appear for a drug test. Alston neither acknowledged Murphy's request nor appeared for the scheduled test. Later that month, the Board terminated Alston's paid leave for his failure to cooperate with return-to-work conditions.

Joe Canney once again logged into the Union blog on May 16 to besmirch Alston. On this occasion, he identified Alston by name. He wrote that "ALSTON[] [i]s one of the biggest pieces of shit to ever walk into a firehouse!" Alston did not see Joe Canney's post until after he filed this suit.

In June, Acting Chief Robert Ward recommended Pender for a temporary promotion to deputy fire chief. Pender appeared before

the Board, and the Board decided to accept Ward's recommendation. It specifically noted that Pender had served out his discipline related to the voicemail incident.

Although some members of the Union attended a public hearing to speak in favor of Pender's promotion, the Union itself neither took a position nor organized the appearance of Union members. Withal, several members — including Trahon — signed a petition in favor of the promotion in their capacity as Town employees. As Trahon testified, the Union itself generally "does not get involved in hiring or promotions."

Alston did not respond to DeBow's July 21 letter regarding possible modified duty. Nor did he appear for a drug test scheduled for the following August. At the end of August, an outside hearing officer held a pre-termination hearing and found just cause for termination of Alston's employment. The Board voted to adopt the recommendation.

Alston appealed his termination to the Massachusetts Civil Service Commission (the Commission), which denied his appeal without holding an evidentiary hearing. In April of 2018, the state superior court vacated the Commission's decision and remanded the matter for the taking of evidence. Following a ten-day evidentiary hearing, the Commission reversed the Town's edict

in February of 2019 and ordered Alston reinstated with back pay.[1] In Alston/Town, see ___ F.3d at ___ [No. 20-1434, slip op. at 43], we determined that the Commission's decision and findings (D&F) formed a legitimate part of the summary judgment record. As relevant here, the D&F stated:

> No union representative attended this or any similar meeting regarding Firefighter Alston's potential return to work. According to Chief Ford, there was a "strained relationship" between the union and Firefighter Alston. Chief Ford compared the lack of union involvement here with another firefighter who was in jeopardy of losing his job, stating: " . . . I had the union in my office saying what the heck can we do to save this guy's job, they were willing participants in whatever it's going to take, let's not let him lose his job. I had zero interaction with the union as far as they being Gerald's representative."

Prior to his discharge, Alston brought this suit. In so far as it pertained to the Union, the suit culminated in the district court's entry of summary judgment. See Alston, 2020 WL 1615408, at *5.

## II. ANALYSIS

The gravamen of Alston's action against the Union is his claim that the Union's representation of him was tainted by discrimination and retaliation. In service of this claim, he

---

[1] The Massachusetts Supreme Judicial Court rejected the Town's appeal of the Commission's decision on April 27, 2021. See Town of Brookline v. Alston, No. SJC-12974, 2021 WL 1619958, at *1 (Mass. Apr. 27, 2021).

- 17 -

alleges (among other things) that the Union failed to represent him fairly on account of his race, condoned the Town's racially discriminatory and retaliatory actions toward him, neglected to enforce compliance with the CBA's anti-discrimination provision, better represented other (non-black) firefighters with similar disciplinary records, acted so as to deprive him of the equal protection of the laws, retaliated against him for speaking out against racist policies, and conspired with the Town and Town officials to deprive him of constitutionally assured rights and privileges. The district court rejected these importunings, concluding that Alston had identified no genuine issues of material fact and that the Union was entitled to judgment as a matter of law. See Alston, 2020 WL 1615408, at *5. Before us, Alston says that the district court's entry of summary judgment "ignored" relevant evidence and that the record, properly read, evinces genuine issues of material fact regarding certain aspects of the Union's treatment of him.

It is common ground that a district court's entry of summary judgment engenders de novo review. See Houlton Citizens' Coal., 175 F.3d at 184. Applying this standard, we assess the facts in the light most agreeable to the nonmovant (here, Alston) and draw all reasonable inferences in that party's favor. See id. Summary judgment is appropriate only when the record, read in this way, demonstrates that there is no genuine issue as to any material

- 18 -

fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a); Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009).

Even though the nonmovant is entitled to all reasonable inferences from the record, there are limits.  For instance, we will not "draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007); see Kearney v. Town of Wareham, 316 F.3d 18, 22 (1st Cir. 2002) ("Creating a genuine issue of material fact requires hard proof rather than spongy rhetoric.").  And "[i]f a nonmovant bears the ultimate burden of proof on a given issue, []he must present 'definite, competent evidence' sufficient to establish the elements of h[is] claim in order to survive a motion for summary judgment."  Pina v. Children's Place, 740 F.3d 785, 795-96 (1st Cir. 2014) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).

It is against this backdrop that we turn to Alston's specific claims of error.

## A.  Fair Representation Claims.

The operative version of Alston's complaint alleged that the Union's conduct toward Alston violated 42 U.S.C. § 1981. Before the district court, Alston recast this allegation:  he posited that the Union's acquiescence in the Town's discriminatory

and retaliatory conduct, as well as its "omissions when it had a duty to act," transgressed the Union's duty of fair representation. Alston went on to hypothesize that the breach of that duty violated 42 U.S.C. § 1981. See, e.g., Hill v. City of New York, 136 F. Supp. 3d 304, 340 (E.D.N.Y. 2015) (recognizing union acquiescence in employer's discrimination in violation of duty of fair representation as viable theory of liability under section 1981). The district court concluded that the proffered facts did not make out a violation of Alston's right "to make and enforce contracts" under section 1981. Alston, 2020 WL 1615408, at *5.

On appeal, Alston attempts to reinvent his argument. He posits that "the Union violated its contractual obligations to him by condoning and participating" in the Town's allegedly discriminatory behavior. As framed, this claim appears to draw its essence from state contract law, not from the Union's duty of fair representation. See Breininger v. Sheet Metal Workers Int'l Ass'n Loc. Union No. 6, 493 U.S. 67, 79 (1989) (explaining that duty of fair representation does not arise under state contract law); see also United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 62 (1981) (distinguishing claim for breach of CBA from claim for breach of duty of fair representation).

The rub, though, is that Alston did not present a claim for discriminatory breach of contract below. His attempt to switch horses in midstream comes well beyond its expiration date: "[i]f

any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal." Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992). There are no extraordinary circumstances here, and to the extent that Alston's reference to contractual obligation refers to provisions of a contract between him and the Union, we deem that argument waived. Cf. United States v. Lilly, 13 F.3d 15, 18 (1st Cir. 1994) (finding argument waived where "current version" differed materially from that presented to lower court).

So, too, Alston's sporadic attempts to tether his allegations of discrimination and retaliation to section 1981 are unavailing. In his appellate briefing, he neither delineates the applicable legal standard for such claims nor makes the slightest effort to apply section 1981 to the facts of record. Indeed, his only reference to section 1981 in his appellate briefing appears in an explanatory parenthetical to a cited case.[2] For present purposes, that parenthetical carries even less weight because it

---

[2] Specifically, Alston's opening brief contains the following cite and parenthetical: Bonilla v. Oakland Scavenger Co., 697 F.2d 1297, 1304 (9th Cir. 1982) (holding a union has an affirmative obligation to oppose employment discrimination against its members under 42 U.S.C. § 1981).

appears in a section of his opening brief that indiscriminately combines his claims under sections 1981 and 1983.

We long have warned that "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Trying to concoct section 1981 claims from the meager morsels that Alston has provided would require us to do exactly what Zannino forbids. Thus, with respect to Alston's nascent section 1981 claims, "we see no reason to abandon the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."[3] Id.

Despite these waivers, Alston is not left holding an entirely empty bag. His briefs repeatedly argue that the Union improperly represented him, that it condoned the Town's discriminatory and retaliatory conduct, and that it failed to ensure that the CBA's anti-discrimination provision was honored by the Town. These arguments closely resemble the duty-of-fair-representation argument that he made below. See, e.g., Alston,

_____

[3] For the sake of completeness, we add that it would make no difference if Alston had properly preserved his claims under section 1981. As we explain below, see text infra, the theory of liability that undergirds those claims — the Union's alleged breach of the duty of fair representation — is unsupported by the record.

- 22 -

2020 WL 1615408, at *4 ("Alston contends the Union participated in and tacitly acquiesced to discriminatory and retaliatory conduct against Alston in violation of its contractual duty of fair representation to him."); see also Emmanuel v. Int'l Brotherhood of Teamsters, Local Union No. 25, 426 F.3d 416, 419-20 (1st Cir. 2005) (explaining that duty of fair representation guarantees fairness in union enforcement of CBA and representation of union members). Accordingly, we deem them preserved and proceed to address them on their merits.

At the outset, a brief primer may be useful. At all relevant times, the Union had a CBA with the Town for a bargaining unit that encompassed the Town's firefighters. "[A]s the exclusive bargaining representative of the employees, . . . [a] [u]nion ha[s] a statutory duty fairly to represent all of those employees, both in its collective bargaining . . . and in its enforcement of the resulting collective bargaining agreement." United Steelworkers of Am. v. Rawson, 495 U.S. 362, 372 (1990) (quoting Vaca v. Sipes, 386 U.S. 171, 177 (1967)). This duty is commonly known as the "duty of fair representation." Id.

A union breaches this duty by acting arbitrarily, discriminatorily, or in bad faith toward a member. See Morales-Vallellanes v. Potter, 339 F.3d 9, 16 (1st Cir. 2003). Negligence — without more — is insufficient to establish a breach of the duty. See Rawson, 495 U.S. at 372-73.

- 23 -

The duty of fair representation is colored by the special relationship between a union and its members. The nature of this special relationship has a direct bearing on judicial review: in determining whether a breach of the duty of fair representation has occurred, an inquiring court's evaluation of the evidence concerning the union's performance must be "highly deferential" to the union. Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 78 (1991). This deference imposes a "heavy burden" on a member of the bargaining unit who asserts a breach of the duty. Morales-Vallellanes, 339 F.3d at 16.

A cardinal reason for this deference is that the collective bargaining system necessarily "subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit." Vaca, 386 U.S. at 182. The deference afforded to the union's decisionmaking recognizes its obligation to balance the competing interests of all union members. See Emmanuel, 426 F.3d at 420 ("[T]he reviewing court must accord the union's conduct substantial deference[,] . . . [and t]his standard of review recognizes that unions must have ample latitude to perform their representative functions."); Dutrisac v. Caterpillar Tractor Co., 749 F.2d 1270, 1273 (9th Cir. 1983) ("Because the union must balance many collective and individual interests when it decides whether and to what extent to pursue a particular grievance, courts should accord substantial deference

to the union's decisions."). Given this obligation, "[t]he complete satisfaction of all who are represented is hardly to be expected." Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953).

In the case at hand, Alston mounts two principal lines of argument as to how the Union allegedly breached its duty of fair representation. The first line of argument posits that the Union acted in bad faith. "A union acts in bad faith when it acts with an improper intent, purpose, or motive." Bryan v. Am. Airlines, Inc., 988 F.3d 68, 74 (1st Cir. 2021) (quoting Good Samaritan Med. Ctr. v. NLRB, 858 F.3d 617, 630 (1st Cir. 2017)). To establish that the Union's exercise of judgment was in bad faith, Alston must adduce "substantial evidence of fraud, deceitful action or dishonest conduct." Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge, 403 U.S. 274, 299 (1971) (quoting Humphrey v. Moore, 375 U.S. 335, 348 (1964)). Having in mind the complexities inherent in a union's obligation to balance a constellation of individual and collective interests, it is possible for a union to act in good faith while at the same time making rational decisions that may be adverse to an individual union member's interests. See Barr v. United Parcel Serv., Inc., 868 F.2d 36, 43-44 (2d Cir. 1989).

Alston's most loudly bruited evidence of bad faith consists of an offer by the Union president (Trahon) to represent Alston at the May 2014 meeting without disclosing that he had

- 25 -

advocated for more safety measures following Alston's "going postal" comments. Relatedly, Trahon went to the meeting but, at the insistence of a municipal official (DeBow), attended only as an observer. As we explain below, these facts fall far short of evincing bad faith.

We start with the "going postal" comments. Affording the Union's decisionmaking the requisite degree of deference, it was the Union's obligation both to protect its members from perceived threats to their safety and to ensure that any discipline meted out to Alston comported with the CBA. See id. at 43. Although those obligations were not congruent, the Union had to do what it could to carry out both of them. As long as the Union satisfied its responsibility to balance those competing interests, the fact that it took Alston's comments more seriously than he might have wished was merely an unfortunate byproduct. See Ryan v. New York Newspaper Printing Pressman's Union No. 2, 590 F.2d 451, 457 (2d Cir. 1979). ("Although it is unfortunate that in this case the ultimate harm fell on appellants, drawing the line elsewhere would, or reasonably could have been thought would, have caused harm to others."). Alston hardly can question Trahon's right — indeed, his duty — to advocate for reasonable safety measures in the workplace. We conclude, therefore, that Trahon's support of safety measures, standing alone, is grossly inadequate to establish bad faith on the Union's part.

Nor was Trahon's silence at the meeting a harbinger of bad faith. Alston has identified no evidence that would permit a reasonable inference that Trahon's offer to help him was deceitful, dishonest, or prompted by some nefarious motive. What scant evidence there is points in the opposite direction. The relevant discussion at the meeting centered on whether the Town should impose back-to-work conditions on Alston. After the Union concluded that one of those conditions — the proposed fitness-for-duty evaluations — might be in breach of the CBA, it repeatedly communicated to the Town that it opposed the imposition of that condition. Without prompting from Alston, Trahon called DeBow to object to the medical evaluation as a return-to-work condition. What is more, he later wrote to the Town in furtherance of that objection. He also communicated with Alston to advise him about how best to handle Chief Ford's direct order to appear for a medical evaluation. At no point did Trahon or the Union act contrary to Alston's stated interest in avoiding the proposed fitness evaluations.

Nor does Trahon's silent attendance at the May 2014 meeting change the calculus. Trahon's silence at the meeting was not through choice. Moreover, nothing in the record suggests that Trahon's silence was a manifestation of an improper purpose. Trahon offered Alston Union representation even without a request from Alston; he attended the meeting knowing that Alston was

- 27 -

accompanied by his own counsel; he knew that it was standard practice for the Union to defer to a member's personal attorney; and it was DeBow — the Town official who was in charge of the meeting — who dictated that Trahon's role would be limited to that of an observer. For aught that appears, Trahon's choice was either to forgo attending the meeting or to attend in silence. To complete the picture, we think it relevant that when the meeting ended, Trahon told Alston that the Union would stand by him and help his cause. Alston neither responded nor subsequently asked for Union assistance. He never asked the Union, say, to file a grievance.

The bottom line is that Alston offered no definite, competent evidence from which a rational factfinder could determine that either Trahon or the Union acted in bad faith. As a result, we discern no error in the district court's rejection of Alston's duty-of-fair-representation claim insofar as that claim was premised on allegations that the Union had acted in bad faith.

Alston's second line of argument as to how the Union allegedly breached its duty of fair representation posits that the Union acted in a discriminatory fashion and in retaliation for his opposition to what he viewed as the Town's alleged discrimination against him. To establish that the Union acted discriminatorily, Alston must show "substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union

- 28 -

objectives." <u>Lockridge</u>, 403 U.S. at 301; <u>see</u> <u>Addington</u> v. <u>US Airline Pilots Ass'n</u>, 791 F.3d 967, 984 (9th Cir. 2015). To this end, Alston marshals a wide-ranging collection of slights that he strives to lay at the Union's doorstep. Stripped of the pejorative rhetoric in which they are couched, these allegations — whether viewed singly or in combination — cannot bear the weight that Alston loads upon them.

Before training the lens of our inquiry on Alston's allegations of discrimination, we offer a caveat. Because Alston's allegations implicate incidents occurring over a period of several years, many of which are fleeting, it would serve no useful purpose for us to attempt to catalog them all. Instead, we deal only with the more conspicuous of them. Alston's other allegations are either fatally underdeveloped, patently meritless, or both.

Our starting point is Alston's claim that a finding of discrimination can be premised on the Union's failure to oppose Pender's promotion to temporary fire captain. Pender, however, was himself a member of the Union, and the promotion was made by the Board in the ordinary course of municipal business. At the time, Alston neither opposed the promotion nor requested the Union to file a grievance regarding it. That the Union did not itself challenge an unopposed promotion of a Union member who had served his unobjected-to punishment for the voicemail incident does not,

standing alone, comprise definite and competent evidence of discrimination.[4]  See Lockridge, 403 U.S. at 301.

Relatedly, Alston tries to anchor his claim of discrimination in the Union's failure to respond to Pender's continued retaliation against him.  But a union does not have a duty of prescience, and it cannot be expected to deal with matters of which it has no knowledge.  Cf. McLeod v. Arrow Marine Transp., Inc., 258 F.3d 608, 612 (7th Cir. 2001) (concluding that union "cannot be faulted" for failing to investigate issue neither brought to union's attention nor raised in employees' grievances); NLRB v. Greenleaf Motor Express, Inc., 872 F.2d 1027 (Table), at *5 (6th Cir. 1989) (finding no acquiescence by union when "[u]nion did not know of the Company's unfair labor practices").  On this point, Alston testified that he did not report either of the two allegedly retaliatory incidents (the February 2011 and October 2013 interactions) to the Union.  Nor did he file a grievance concerning Pender's conduct.  Without a showing that the Union knew of the alleged retaliation — and no such showing has been made here — the Union's inaction could not be intentional and,

---

[4] We add, moreover, that Alston's claim is undermined by the absence of proof that the Union holds any sway over promotions, that it has ever sponsored or opposed a particular promotion, or that it is at all involved in the promotional process within the Department.

thus, could not be discriminatory. See Lockridge, 403 U.S. at 301.

Next, Alston tries to hinge his claim of discrimination on the Union's assistance to Pender in obtaining reimbursement for the pay he had lost while suspended, thus ameliorating the punishment levied for Pender's act of racial harassment. The record is utterly barren, though, of any evidence suggesting that the Union sought that reimbursement for some discriminatory reason. Pender, a Union member, asked for Union representation, and the Union provided it (as it was bound to do under its duty of fair representation). See Rawson, 495 U.S. at 372. Ordinarily, a union's representation of a union member facing discipline constitutes a legitimate union obligation. See Lockridge, 403 U.S. at 301; see also Addington, 791 F.3d at 984 (explaining that "a union must act with some legitimate union purpose that 'rationally promote[s] the aggregate welfare of employees in the bargaining unit'" (quoting Rakestraw v. United Airlines, Inc., 981 F.2d 1524, 1535 (7th Cir. 1992))). Here, nothing about the Union's action was out of the ordinary: that the reimbursement indirectly lessened Pender's punishment for the voicemail incident does not evince discrimination against Alston. See Lockridge, 403 U.S. at 301.

In a variation on this theme, Alston submits that the reimbursement of Pender's pay "softened" Pender's discipline as

compared to the discipline meted out to Alston. This shift in focus does little to rehabilitate Alston's failed claim of discrimination. Advocating for members who request help on matters such as pay and discipline is a quintessentially union objective, see id., and the Union's pursuit of that objective in this instance was not adverse to Alston.[5]

Alston also seeks to base his discrimination claim on a salmagundi of loosely related acts and omissions. These include the fact that the Union stopped inviting him to sing the national anthem at Union social gatherings; the fact that the Union did nothing when Alston told Trahon that he wanted to address the Union membership; the fact that Trahon took no action in connection with the "Leave" incident; the Union's suspension of Alston for his failure to pay dues; the Union's connection with messages composed by a Union member (Joe Canney); and the Union's failure to act after the Town removed Alston from the payroll. None of these acts and omissions moves the needle.

With respect to the national anthem, Alston sometimes had been asked, on an impromptu and unpaid basis, to sing when he

---

[5] We note that Alston himself could have sought Union representation when his pay was halted in 2014 and asked the Union to seek reimbursement for him. He chose not to do so. The absence of evidence is not evidence of absence, and the fact that a request for help was never made and therefore never denied cannot ground a finding of discrimination. Cf. Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 73 (1st Cir. 2011) (explaining that "a nonexistent denial cannot support [a] discrimination claim").

attended Union social gatherings. To the extent that Alston exhorts us to infer discrimination or retaliation from the drying-up of invitations to sing, his exhortations ring hollow. There is no evidence that the Union ever invited Alston to social gatherings for the specific purpose of singing the national anthem. Rather, the record reflects that if he happened to be present at such gatherings, he would usually (but not always) be asked to sing. After the voicemail incident, Alston — of his own volition — stopped attending Union social gatherings, and the Union could no longer ask him to sing because he was no longer in attendance. There is no evidence that the Union denied any requests by Alston to sing the national anthem, that it reduced the frequency of invitations to sing at social gatherings when he chose to attend, or that it prevented Alston from attending such gatherings. In other words, Alston has neither articulated nor established how the Union behaved differently after the voicemail incident. So viewed, his allegations are insufficient to carry the "heavy burden" that he bears in asserting a breach of the Union's duty of fair representation. Morales-Vallellanes, 339 F.3d at 16.

Alston's attempt to link his claim of discrimination to the Union's inaction after he told Trahon that he wanted to address the Union membership is equally futile. Alston — as a Union member in good standing — had the right to attend Union meetings and to speak at those meetings. Yet, Alston testified that no one

prevented him from going to a Union meeting and addressing the membership. Nor does anything in the record warrant an inference that Trahon ever made arrangements for members to speak at Union meetings — and Alston never says what he expected Trahon to do for him. Because there is no evidence either that the Union treated Alston differently from others who wished to speak or that it ever denied Alston the opportunity to speak at a Union meeting, the claim of discrimination founders. See Bhatti, 659 F.3d at 73.

The facts surrounding the "Leave" incident do not advance Alston's cause. To begin, Alston neither reported the incident to the Union nor filed a grievance with regard to it. Nothing in the record suggests that the Union knew about the incident at or near the time that it occurred.

When Trahon eventually learned about the incident, he texted Alston to offer him the Union's support. Trahon also suggested recourse to an employee assistance program, but Alston replied that he was getting help on his own. On these bare facts, Alston leaves us to guess what action he expected Trahon to take. Because an inference of discrimination cannot be based on guesswork, the aftermath of this incident cannot fuel Alston's discrimination claim. See Lockridge, 403 U.S. at 301.

Similarly, the Union's suspension of Alston for failure to pay Union dues does not offer fertile soil for a claim of discrimination. To be sure, the Union did suspend Alston when he

failed to pay his dues.  But Alston's claim of discrimination is meritless:  the suspension was carried out in full conformity with the rules governing Union membership; those rules, on their face, are not discriminatory; and Alston himself testified that his suspension was not in any way retaliatory or discriminatory.

Alston's effort to hitch his claim of discrimination to Joe Canney is futile.  The genesis of this claim reposes in Joe Canney's authorship of two blog posts and an email that disparaged Alston.  There is a dispute as to whether Joe Canney was a Union officer at the relevant times, and we assume (favorably to Alston) that he was.  Even so, Joe Canney's trio of messages do not suffice to allow an inference of discrimination.

We need not tarry.  There is simply no evidence either that Joe Canney was acting in his capacity as a Union officer when he wrote the messages or that the Union in any way authorized, endorsed, or condoned them.[6]  That is game, set, and match.  See Weigand v. NLRB, 783 F.3d 889, 897 (D.C. Cir. 2015) (declining to hold union liable when it "did not authorize or otherwise condone

---

[6] The evidence on this issue, though minimal, points the other way:  the Union took down the first post immediately after Alston complained to Trahon.  As to the second post, Alston himself did not know of it until after he filed suit in federal court, which suggests that it was swiftly removed.  And, finally, although Trahon was copied on Joe Canney's 2015 email, there is no evidence that the Union either agreed with its content or republished it. See Weigand v. NLRB, 783 F.3d 889, 897 (D.C. Cir. 2015).

- 35 -

the posting of the contested messages on the Facebook page" accessible to only union members and maintained by the union).

Finally, the Union's failure to take action when the Town removed Alston from the payroll does not manifest discrimination. Alston never filed a grievance, and he does not describe any particular action that he contends the Union should have taken. By the same token, he does not identify any similar situation in which the Union — without a request from the affected firefighter — intervened. There is, therefore, no evidence from which a rational factfinder could infer that Alston was treated differently from other firefighters. Cf. Goodman v. Lukens Steel Co., 482 U.S. 656, 669 (1987) (inferring discrimination when union categorically "ignored racial discrimination claims on behalf of blacks" while "pursuing thousands of other legitimate grievances").

Although this completes the litany of loosely related acts and omissions on which Alston relies, there are two more hooks on which he endeavors to hang his discrimination claim. Both of these hooks involve Lieutenant Cronin.

First, Alston notes the Union's failure to intervene after the Town denied Cronin's request to have Alston work next to Lieutenant Robinson at "street level." That request, though, was made in 2013, and the record is undisputed that Trahon did not see Cronin's letter until 2018 (well after Alston had been cashiered).

Nor did Alston otherwise bring either the request or the Town's refusal to act on it to the Union's attention in the relevant time frame. On this record, there is no way that the Union's omission can be termed "intentional" and only intentional discrimination is actionable under the duty of fair representation. See Lockridge, 403 U.S. at 301.

Second, Alston complains that the Union failed to investigate Cronin's allegation that members of its executive board told senior white firefighters to stay away from, or be careful around, Alston. In support, Alston relies exclusively on DeBow's handwritten notes of a conversation with Fay (Trahon's predecessor as Union president). The notes, however, merely pose a question: "Did E-Board members visit Station 7 to tell White Sr. Members to stay away from or be careful around Alston?" According to the notes, Fay's response was unambiguous: "No, never. That didn't happen. Ron [Cronin] is lying." Although we must draw all reasonable inferences in Alston's favor at the summary judgment stage, no rational factfinder could infer from this scrap of evidence alone that members of the Union's executive board communicated any warning at all to senior white firefighters. See Cabán Hernández, 486 F.3d at 8. The "definite, competent evidence" needed to defeat a motion for summary judgment, Pina, 740 F.3d at 796, is wholly lacking. As we repeatedly have warned, "conjecture cannot take the place of proof in the summary judgment

- 37 -

calculus." Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007).

Of course, the whole sometimes can be greater than the sum of the parts. Thus, a series of events, none of which is by itself sufficient to show discrimination, may in cumulation suffice. See Lockridge, 403 U.S. at 301; see, e.g., Trail v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 542 F.2d 961, 968 (6th Cir. 1976). Here, however, Alston does not articulate how the Union's actions collectively support an inference of discrimination or how those acts and omissions interlock to form a pattern of discrimination. None of these events independently evinces either discriminatory intent or racial animus and, absent some developed argumentation — and Alston offers none — a rational factfinder could not infer that these events, taken in the ensemble, evince either discriminatory intent or racial animus. See Zannino, 895 F.2d at 17.

The short of it is that Alston has plucked a smattering of discrete events from a six-year history of antipathy between him and the Town, tried to cast the Union as a villain, and spun a narrative that tries to attribute his troubles with the Town to the Union. This narrative does not withstand scrutiny because it is spun not out of hard facts and supportable inferences but, rather, out of wispy strands of speculation and surmise. For this

reason, the district court did not err in granting summary judgment to the Union on Alston's duty-of-fair-representation claims.

### B.  Remaining Claims.

We need not linger long over Alston's remaining claims. He asserts two claims under 42 U.S.C. § 1983 and a final claim under 42 U.S.C. § 1985.  All of these claims strike by-now-familiar chords:  they rely on evidence already discussed (and found wanting) in other contexts.

With respect to section 1983, he first alleges that the Union discriminated against him on the basis of race in violation of his equal protection rights.  He further alleges that the Union retaliated against him for exercising his First Amendment right to speak out against race discrimination.  And with respect to section 1985, he alleges that the Union, the Town, and various Town officials engaged in a civil conspiracy to deprive him of constitutionally assured rights and privileges.  Before us, he challenges the district court's grant of summary judgment in favor of the Union on these three claims.

To maintain a claim under section 1983, Alston must establish both that the Union acted under color of state law and that its conduct deprived him of a federally protected right.  See Soto v. Flores, 103 F.3d 1056, 1061-62 (1st Cir. 1997); Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995).  A person is a state actor under section 1983 if he is a state official, if "he has

- 39 -

acted together with or has obtained significant aid from state officials," or if "his conduct is otherwise chargeable to the State."[7]  Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982); see Gonzalez-Morales v. Hernandez-Arencibia, 221 F.3d 45, 49 (1st Cir. 2000).  Where, as here, the plaintiff proceeds against a private entity, we must plumb the record for evidence that that entity "aligned [itself] so closely with either state action or state actors that the undertow pulls them inexorably into the grasp" of section 1983.  Perkins v. Londonderry Basketball Club, 196 F.3d 13, 17 n.1, 18 (1st Cir. 1999) (quoting Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253-54 (1st Cir. 1996)).

The Union argued, in its brief on appeal, that it never undertook joint activities regarding Alston either with the Town or with any Town officials.  Relatedly, the Union argued that the actions of which Alston complains, including the representation of Pender and the support of safety measures after Alston's "going postal" comments, are textbook examples of union conduct.  In the Union's view, it necessarily follows that Alston failed to

---

[7] In our ensuing state-action analysis, we treat the Town — consistent with Alston's theory of the case — as a state actor. See Perkins v. Londonderry Basketball Club, 196 F.3d 13, 18 n.3 (1st Cir. 1999); see also Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 191 (1988) ("[Section 1983] liability attaches only to those wrongdoers who carry a badge of authority of a State and represent it in some capacity. . . ." (internal quotations omitted)).

establish the Union's requisite alignment with state action or state actors.  See Perkins, 196 F.3d at 18.

In his reply brief, Alston offered no rebuttal to this argument.  But he did counter — albeit in support of his section 1985 claim — that the Union conspired with the Town.  Because a conspiracy between a state actor and a private party to accomplish a prohibited end constitutes state action, see Casa Marie, Inc. v. Superior Ct. of P.R. for Dist. of Arecibo, 988 F.2d 252, 259 (1st Cir. 1993), we consider his section 1983 and section 1985 claims together, and we treat the evidence that Alston cites in support of his section 1985 claim as comprising his best evidence of state action.

To establish his claim for civil rights conspiracy, Alston must show that "two or more persons act[ed] in concert to commit an unlawful act, or to commit a lawful act by unlawful means."  Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (quoting Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir. 1979)).  The principal elements that Alston must satisfy in this instance are the existence of "an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages."  Id. (internal quotations omitted) (quoting Hampton, 600 F.2d at 620-21).  In evaluating whether the record supports the existence of the claimed conspiracy, we must take into account the totality of the circumstances.  See id. at

843. Because "the agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof," we typically rely on inferences to conclude that such an agreement was made. Id. Those inferences, however, must be reasonable and must be supported by a plausible rendition of the facts of record. See Est. of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008); Earle, 850 F.2d at 843.

Alston's main argument on this point seems to be that the Union had an implied agreement with the Town to condone discrimination and retaliation. In support, he calls our attention to the Union's inaction in two instances: the Union did not object to the Town's denial of Lieutenant Cronin's request to have Alston work next to Lieutenant Robinson; and the Union sat by and "allowed" Pender to be promoted. Neither instance advances Alston's cause.

Here, it is undisputed that Union leadership did not learn of Cronin's request until 2018 — roughly five years after the request was made and long after Alston had ceased working. Moreover, the record is devoid of any evidence that the Union had anything to say about Pender's promotion. See supra note 4 and accompanying text. Above and beyond those gaps in the record, the most significant data point is that Alston cites no evidence, direct or circumstantial, suggesting that the Union's inaction with respect to those particular matters was as a result of

coordination with the Town. Consequently, there is no principled way in which we can find that either instance evinces purposeful participation in concert with the Town. See Lugar, 457 U.S. at 941.

Alston also suggests that another instance of the Union's inaction — its failure to follow up when Cronin speculated that the Town's human resources director, DeBow, "had a conflict of interest in investigating Alston's complaints" — is evidence of concerted activity. This suggestion seemingly refers to a statement in Cronin's 2013 letter requesting that Alston be assigned to work next to Lieutenant Robinson. In that communiqué, Cronin griped that the Town had selected DeBow, who was named in Alston's MCAD complaint, to "investigat[e] [her]self." There is, however, no evidence that anyone in Union leadership was aware of Cronin's concern until 2018, nor is there any evidence that the Union chose not to object to DeBow's investigative role due to some agreement, express or implied, with the Town.

Alston next claims that "[t]he Union and [the Town] concealed Trahon's conflict of interest in representing Alston at the 2014 disciplinary meeting" — the meeting that resulted in the imposition of a set of conditions on Alston's return to work. This claim is baseless. The idea that Trahon (the Union president) had a conflict of interest apparently rests on evidence that DeBow instructed Trahon that he could only observe during the meeting.

By insisting that Trahon's role at the meeting be limited to that of an observer, DeBow was exercising her prerogative as the official in charge of the meeting. For aught that appears, Trahon's choice at that point was either to agree to assuming observer status or to refrain from attending the meeting. Seen in this light, the record does not bear out Alston's contention that Trahon, by heeding the stipulation that DeBow unilaterally imposed, was acting in concert with the Town against Alston's interests. There is, moreover, other evidence in the record showing, with conspicuous clarity, that DeBow and Trahon were not in lockstep concerning the return-to-work conditions. The Union strongly opposed DeBow's proposed medical-evaluation condition and repeatedly made its opposition to the return-to-work conditions known to municipal officials notwithstanding Alston's decision not to request Union assistance regarding the matter. Thus, Alston's ipse dixit that the Union "allow[ed] [the Town] to impose the return to work conditions on Alston that ultimately led to his termination" is too weak to underpin his "state action" claim. Cf. Casa Marie, 988 F.2d at 259 (refusing "to credit . . . conclusory [conspiracy] allegation[s] as a sufficient basis for finding 'state action'").

Taking a different tack, Alston contends that, subsequent to his "going postal" comments, the Union "fueled" the Town's "false narrative" that Union members needed police

protection from him. But even if we assume, for argument's sake, that both the Town and the Union deemed Alston a threat to the safety of other firefighters and sought to depict him as such, the record is bereft of any evidence, direct or circumstantial, that the Town and the Union sought to do so in concert. What evidence there is points in the opposite direction: the Town not only rejected the Union's request for a police presence at the firehouses but also refused to furnish the Union with any information about Alston's threats (insisting that such information was confidential). That both the Town and the Union independently concluded that a firefighter making comments about shooting up a workplace posed a threat to employee safety, without more, falls far short of establishing that the two actors coordinated their response. Cf. Earle, 850 F.2d at 843 (declining to infer conspiratorial agreement between state troopers and town officers when state troopers had an independent duty to respond to defendant's threats to safety); Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 324 (2d Cir. 2002) (noting that "conclusory allegations of conspiracy ring especially hollow in light of the adversarial relationship between the County and [the union]").

Alston's section 1985 claim against the Union is no more robust. "Section 1985 provides a remedy for acts of civil conspiracy in which two or more individuals conspire for the purpose of depriving another of rights or privileges accorded to

them by law." Spiegel, 988 F.3d at 577; see 42 U.S.C. § 1985(3). Virtually by definition, an essential element of a section 1985 claim is a conspiracy between the defendant (here, the Union) and another party. See Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996). As we already have made clear, Alston has failed to substantiate his allegations of conspiratorial conduct involving the Town and the Union.

In sum, Alston has identified no evidence in the record adequate to support either a finding of state action on the Union's part or a finding of concerted activity involving the Union and the Town. It necessarily follows that both his section 1983 claims and his section 1985 claim fail as a matter of law. Inasmuch as the record contains no genuine issue of material fact as to the Union acting under color of state law or purposefully participating in a conspiracy with the Town, we hold that the district court did not err in granting summary judgment to the Union on these claims.

## III. CONCLUSION

We need go no further. Although Alston and the Union may not have always been on the same page, that is a far cry from the requisite showing that the Union engaged in race-based discrimination or retaliation against Alston, that it failed to afford him fair representation, that it acted in ways calculated to deny his equal protection or free speech rights, or that it

- 46 -

purposefully participated with the Town in a conspiracy proscribed under the civil rights statutes.  For the reasons elucidated above, the district court's entry of summary judgment in favor of the Union is

**Affirmed**.